**CAROLINA ENVIRONMENTAL STUDY GROUP, INC., et al., Plaintiffs,**

v.

**UNITED STATES ATOMIC ENERGY COMMISSION et al., Defendants.**

No. C–C–73–139.

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 31, 1977.

Norman B. Smith, Smith, Patterson, Follin & Curtis, Greensboro, N. C., George S. Daly, Jr., Casey & Daly, Charlotte, N. C., William B. Schultz and Alan B. Morrison, Washington, D. C., for plaintiffs.

Douglas M. Martin, Asst. U. S. Atty., Charlotte, N. C., Joseph DiStefano, Atomic Energy Commission, Peter L. Strauss, Gen. Counsel, and Stephen F. Eilperin, Asst. Gen. Counsel, James Fitzgerald and E. Leo Slagge, Attys., U. S. Nuclear Regulatory Commission, John T. Boese, U. S. Dept. of Justice, for defendant U. S. Atomic Energy Commission; Joseph B. Knotts, Jr. and J. Michael McGarry, III, Conner & Knotts, Washington, D. C., Clarence W. Walker, Kennedy, Covington, Lobdell & Hickman, and William L. Porter, Duke Power Co., Charlotte, N. C., for defendant Duke Power Co.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Plaintiffs brought this action to obtain a declaration of the unconstitutionality of

those portions of the Price-Anderson Act, 42 U.S.C. § 2210(c) and § 2210(e), which place a limitation of $560,000,000 on the maximum amount of liability of a power company or a contractor for damages resulting from a nuclear accident involving an atomic power plant.

Damages and injunctive relief are not sought.

Defendants in their pleadings denied the merits of the claims of the plaintiffs and asserted that the plaintiffs lack standing and that the claims are not ripe for decision.

On the 21st day of May, 1975, at a hearing on the motion to dismiss, it appeared that full dress consideration was desired on the issues of standing and ripeness. Time was allotted, therefore, to develop evidence, and a hearing, four days in length, was conducted on September 27, 29 and 30 and October 1, 1976, on these subjects. Briefs were subsequently filed and the case is ready for decision.

### THE PLAINTIFFS

Plaintiffs are a group of people with a common interest in protecting themselves, and other present day citizens and their children, against what they see as the deterioration and destruction of their property and the world they live in. Some of them have fought against nuclear power at numerous administrative and legal levels. They have opposed licensing the defendant Duke to *construct* nuclear plants, and they oppose ultimate issuance of a license to *operate* those plants after they are completed. They have not slept on their rights. They are vigorously represented by able and experienced counsel. Their claims are seriously advanced. They number people who live and own property on Lake Norman and at other places within short distances of the McGuire Nuclear Plant and the Catawba Plant, now under construction. They include people who have moved away from homes near the nuclear plants and some who plan to leave the area because the plants are being constructed; people whose use and enjoyment of the lakes and their shores (for living, breathing, swim-

ming, fishing, boating, skiing and gardening) will be affected by operation of the plants; people who have legitimate fears that nuclear power plants are dangerous, and who contend that but for the Price-Anderson Act such dangers would not exist.

### THE PRICE–ANDERSON ACT

The Price-Anderson Act was adopted in 1957. In pertinent part, 42 U.S.C. § 2210(e), it provides:

*"(e) Aggregate liability for a single nuclear incident.* The aggregate liability for a single nuclear incident of persons indemnified, including the reasonable costs of investigating and settling claims and defending suits for damage, shall not exceed (1) the sum of $500,000,000 together with the amount of financial protection required of the licensee or contractor or (2) if the amount of financial protection required of the licensee exceeds $60,000,000, such aggregate liability shall not exceed the sum of $560,000,000 or the amount of financial protection required of the licensee, whichever amount is greater: *Provided,* That in the event of a nuclear incident involving damages in excess of that amount of aggregate liability, the Congress will thoroughly review the particular incident and will take whatever action is deemed necessary and appropriate to protect the public from the consequences of a disaster of such magnitude . . . ."

In other words, $560,000,000 is the maximum amount that all persons injured could recover for injury, death or property damage in the event that a domestic nuclear power plant got out of control.

The Act authorizes the Commission to pay the first $500,000,000 incurred in investigating and settling claims and defending suits from such an accident, but allows the Commission to require that the power companies themselves provide indemnity for at least the first $60,000,000. The Commission is authorized to require that this indemnity by the power companies be increased as the Commission may decide up to an amount of $500,000,000. Some such increases in power

company shares in this indemnity have been required, but the $560,000,000 overall limit remains.

Detailed provisions are made for handling claims. One provision of particular interest is § 2210(*o*), which says that if, upon petition and showing, a cognizant United States district court determines that a particular incident has produced losses that exceed the $560,000,000 limit of liability: (1) payments going beyond 15% of that limit ($84,000,000) may not be made without court approval; (2) payments above 15% must be under a *plan* of distribution or found to be not prejudicial to the subsequent adoption of such a plan; (3) claims for later discovered and future injuries must be provided for; and (4) all further distribution must be determined by the district judge.

## THE NUCLEAR POWER PLANTS IN QUESTION

Defendant Duke Power Company has harnessed many miles of the Catawba River, in Western North Carolina and South Carolina, with numerous dams to supply water for a number of coal fired and water powered and atomic powered electric generating plants. In South Carolina it operates a three-nuclear reactor turbine plant at Oconee, and it has begun the process of building two atomic turbines at a plant on Lake Wylie, also in South Carolina, some fifteen or so miles southwest of Charlotte (population nearly 300,000). The plant on Lake Wylie is called the Catawba Nuclear Station.

In North Carolina, Duke has under construction the McGuire Nuclear Station which is located on Lake Norman, approximately seventeen miles northwest of Charlotte. This plant, a twin-reactor installation of cost reportedly approximating a billion dollars, is nearing completion. Within a fifty-mile radius of each plant, present population is about one and one-half million people, and estimated population in 2000 A.D. is about two million.

The McGuire Nuclear Station is a twin-reactor nuclear pressurized water (PW) power plant, with turbines and controls, designed to produce power enough to supply a million people (about 1,180,000 kilowatts of net electric energy per reactor).

The "furnace" in each half of the plant is the nuclear reactor chamber, or vessel.

The nuclear reactor chamber is a steel cylinder thirty feet or more long and twelve feet or more in diameter, with steel walls ten inches and more in thickness. With controls and a load of uranium oxide fuel, it weighs about five hundred tons, or one million pounds.

The reactor chamber is situated below ground level in the containment building, which is somewhat more fully described later on. The relative sizes and positions of the reactor chamber within the containment building are very roughly illustrated if one visualizes a somewhat elongated and symmetrical goose egg sitting on one end in a hole in the ground with a ten-gallon can turned upside down above it, and with numerous other pipes, tanks and other installations mounted elsewhere in the can.

Heat is produced in the reactor by splitting atoms. This is done by bringing together a "critical mass" of uranium oxide fuel.

The uranium oxide fuel is contained in cylindrical pellets about the diameter (.366 inches) of a blank .32 caliber pistol cartridge and .60 inches in length. These pellets are enclosed, end on end, in metal "fuel rods," twelve feet long and .422 inches in diameter. A group of 50 to 200 fuel rods makes a fuel "assembly," and there are several hundred "assemblies" in the reactor "core." Total weight of the fuel thus enclosed in each reactor is about one hundred tons.

No blueprint was supplied as to the exact mechanism by which atomic reactions in the fuel assemblies are started and shut off. Apparently, however, it works this way:

The *fuel rods* in the reactor stand on end, with vacant spaces among them.

*Control rods,* with some type of insulating or shielding function, are let down from above, and occupy the spaces among the

fuel rods and separate the fuel rods, thereby preventing atomic reaction. The physical layout is roughly similar to that which would obtain if one hair brush were laid on a table with its bristles (fuel rods) sticking up, and another hair brush were pressed down on it with its bristles (control rods) pointing down.

When heat is desired, the control rods are lifted, the fuel in the fuel rods starts reacting, and atomic fission or atom-splitting takes place.

When the control rods are re-inserted, atomic *fission* stops and heat *from atomic fission* stops.

However, once atomic fission has been begun, *decay of the atomic materials also begins,* and *the atomic fuel continues to decay and give off heat.* This radioactive decay continues, unstoppable, for hundreds of thousands of years.

This radioactive decay is in fact the source of about seven per cent of the reactor's output of heat.

In a small reactor this might not be of great significance.

In a reactor the size of those now under construction, this 7% constant heat from atomic decay of 100 tons of uranium fuel is of critical importance. It is about 80,000 kilowatts per reactor—enough heat to supply the power needs of a city of about 35,000 people.

Unlike the controlled nuclear fission, it cannot be shut off.

It is enough heat to melt through the thick steel walls of the reactor core in a few hours, unless it is effectively cooled.

This is called a core melt.

A core melt can melt through the floor and into the earth beneath it.

It can also break through into the containment building and produce an explosion by generating steam in the waters of the cooling system, or in other materials, and rupture the containment building which houses the reactor, and discharge radioactive contaminants into the atmosphere.

This would be the worst of the numerous possible consequences of a nuclear power plant accident.

No *nuclear explosion* is likely or even possible, because the fuel used in nuclear reactors does not contain a high enough proportion of Uranium-235 to produce such an explosion.

However, the capacity to contaminate large areas in the event of a core melt and the escape into the atmosphere of nuclear contaminants is quite large; each reactor contains *about 1,000 times* the amount of radioactive material as the bomb which devastated Hiroshima.

Heat within the reactor, unchecked, can reach 5,000 degrees Fahrenheit.

Taming this heat to produce power and to promote safety is an engineering marvel. Water, in extremely large quantities, is the medium for these purposes.

In regular operation, the plant has two principal circulating water circuits.

The reactor circuit transfers heat from the reactor vessel (the "furnace") to the steam generators (the "boilers"). This is a closed circuit. In the reactor, water is heated to 600 degrees under pressures up to 2,200 pounds per square inch, or "50 to 100 times" the pressures in automobile tires. From the reactor the water goes through pipes to the steam generators, where, still contained in its own closed pipe system, it gives up some of its heat to convert water in the generators into live steam to turn the turbines. It then, as "cool" water (550 degrees) returns to the reactor to be heated again.

The superheated water which circulates from within the reactor vessel to the steam generators and back is of course highly radioactive and in normal operation is not vented to nor discharged into the lake or the atmosphere; it works in a closed system analogous to that of a refrigerator or an air conditioning system.

The second major water circuit brings water from the lake, through various strainers and cleaners, pumps it into the steam generators where it becomes steam,

channels it as live steam into the steam turbines where it expands and turns the turbines that turn the electric generators, condenses it back from steam to warm water, and conveys it through cooling basins or towers back to the lake again.

These processes require incredible amounts of water—shown by the Environmental Impact Statement, Government Exhibit 27, page 3–3, if I have read it correctly, as one and one-half million to two million gallons of water per minute. Two million gallons a minute is eight hundred tons a minute or over thirteen tons per second. The entire plant's maximum use of water is 4,610 cubic feet per second (Government Exhibit 27, page 3–1). The average flow of the Catawba River, 1964 through 1974, varied from 1,635 cubic feet per second in 1976 to 3,659 cubic feet per second in 1973.

Discharge of spent cooling water into the lake will raise the temperatures in large areas of the lake to 95 degrees or more in hot weather—with immediate effects on the environment. About 2,200 of the 4,500 megawatts of heat generated will be discharged into the cooling tower and the lake.

For any given electrical output, an atomic plant wastes and discharges about fifty per cent more heat through warm water than a coal fired plant of the same capacity.

Each nuclear vessel and its steam generators are housed in a "containment building," cylindrical in shape, 125 feet or so in diameter, dome-roofed, and perhaps 190 or 200 feet tall. The function of this building is to contain the products of a nuclear accident if one occurs, and to minimize the likelihood of an escape of nuclear contaminants to the outside atmosphere. It is strongly built. It has a ¾-inch inner steel wall, a center cavity five or six feet thick, filled with ice maintained at zero degrees, and a reinforced outer concrete wall three or four feet thick.

Since 7% or so of the reactor's heat is produced by an un-interruptible radioactive decay process, it is necessary that cooling water be regularly circulated through the atomic reactor *without interruption, even when the furnace is "shut off,"* to prevent a dangerous build-up of heat and a melting of the reactor vessel itself (a "core melt") from decay of the radioactive materials.

Emergency cooling systems are provided to keep the reactor cool in the event the regular cooling systems fail. These standby cooling devices are designed to flood the reactor and, if necessary, the containment building in which it is housed, with water, to keep the reactor from melting.

These devices to control the heat in the event of a breakdown are therefore of critical importance; and the most massive and complicated elements in the entire plant are those pumps and pipes and tanks and valves and electric and hydraulic controls and "back-up" controls which are designed to keep enough water running through and around the reactor vessel to keep it cool in spite of this uninterruptible generation of heat through atomic decay.

There has been no actual operating test of the functional ability of the emergency core cooling systems on a reactor this large, although the various components are carefully designed and individually tested.

Part of the hearing was a guided tour of the McGuire Nuclear Station, the twin turbine plant under construction at Lake Norman.

This tour left the writer thoroughly impressed by two things:

The first is the complexity and monumental nature of the task of handling a beast (or genie) of such tremendous power as an atomic reactor capable of generating one and a quarter million net kilowatts.

The second is the obvious competence and discipline and engineering know-how and determination with which the people of Duke Power Company are pursuing the construction of the plant and the taming of this Promethean power.

If and to the extent that the job can be safely and efficiently done, in the present state of the art, I am satisfied that it is their purpose to do it, and that to the extent it can be done they are accomplishing it.

## WHAT A NUCLEAR POWER PLANT DOES TO PLAINTIFFS AND THE ENVIRONMENT

Operation of the nuclear power plants will have *immediate* or present effects and *potential* or future possible effects on plaintiffs and their environment.

### Immediate Effects

*Immediate* effects include the following:

1. It will, despite the stout construction of the containment building, produce immediate additional, nonnatural radiation which will in small quantities invade the air and the water where several of the plaintiffs and many thousands of other people live.

2. It will produce a sharp increase in the temperature of several square miles of the two lakes involved. This will make the water too warm for pleasurable swimming and boating in the summertime, will increase the growth of scum or algae and rank water plants, and increase the growth of certain types of fish of the less desirable species. (Coal fired power plants also heat lake water, but atomic plants produce 50% more heat per kilowatt than coal plants.)

3. It will produce present fear and apprehension objectively reasonable, on the part of the plaintiffs and others, as to the effect of the increased radioactivity in air, land and water upon them and their property, and the genetic effects upon their descendants.

4. It will interfere with normal use of the waters of the Catawba River.

5. Though it has not yet reduced the dollar value of neighboring lands, it threatens to do so; some plaintiffs have moved away because the plants are under construction, and at least one other is sufficiently apprehensive that he intends to move out of the community because the plants are being constructed.

6. The likelihood of an accident resulting in uncontrolled release of large or even small quantities of radioactive material into air, water or land, will constitute a continual threat to the plaintiffs and others similarly situated, based upon the distinct possibility that the plaintiffs may suffer a taking or destruction of their land or their health or their property or their lives, all without adequate assurance that compensation will ever be provided.

### Potential Effects

*Potential* effects are the damages which may result from a core melt or other major accident in the operation of a reactor, or from an accident in transportation of the poisonous waste products of nuclear fission.

Since the plaintiffs do not contend that any single accident in transportation of the poisonous products can produce damages in excess of $560,000,000, no discussion will be addressed to transportation accidents.

The potential effects from a core melt are a drastically different subject. Such a core melt has never occurred, although one was seriously threatened at Brown's Ferry, Alabama, some years ago by a fire in some insulation which was started by a candle being used by a workman. Such a core melt could penetrate the earth and reach underground water courses and local rivers and streams, depositing strontium 90 and other poisonous materials, and contaminating drinking water sources for many thousands. A core melt could also vaporize the cooling waters, and certain types of concrete, and produce a pressurized breach of the containment building and discharge large volumes of hot radioactive dust or vapor into the air.

If the air is stagnant, which is often the case, this radioactive material could settle down for the most part in the area near the power plant itself. If a strong wind is blowing, this material might be blown along the ground, contaminating air, land and water in generally pie-shaped segments which might be a few miles or scores of miles in length. If the wind is not too heavy, the heated materials might rise and be transported several miles and then descend to earth and water.

Any of these forms of accidents can produce radiation of temporary or longer duration and varying intensity, and can require

evacuation of the areas affected for substantial periods of time. They can produce cancers, thyroid illnesses, genetic effects adverse to later generations, and deaths. The costs of such accidents also include the cost of evacuation and relocation of human beings and industries and farming activity, and the property damage which results.

## THE LIKELIHOOD THAT A BAD ACCIDENT MAY OCCUR, AND THE LIKELIHOOD OF BAD RESULTS FROM SUCH AN ACCIDENT

Most of the evidence at the hearing dealt with the likelihood of a major accident and the extent of injury and damage likely to follow from such an accident.

In October, 1975, the United States Nuclear Regulatory Commission published a "Reactor Safety Study," which was a description of the estimated accident risks in United States commercial nuclear power plants. The main volume excluding appendices is 198 pages long and contains a great deal of information and opinion and tables and statistics. Among its estimates and opinions as to the likelihood of core melt accidents and their likely consequences in injuries, deaths and property damage, are several tables (pages 83, 84 and 85, Government Exhibit 14–B) as follows:

TABLE 5–4  CONSEQUENCES OF REACTOR ACCIDENTS FOR VARIOUS PROBABILITIES FOR ONE REACTOR

| Chance per Reactor-Year | Consequences | | | | |
|---|---|---|---|---|---|
| | Early Fatalities | Early Illness | Total Property Damage $10^9$ | Decontamination Area Square Miles | Relocation Area Square Miles |
| One in 20,000 [a] | <1.0 | <1.0 | <0.1 | <0.1 | <0.1 |
| One in 1,000,000 | <1.0 | 300 | 0.9 | 2000 | 130 |
| One in 10,000,000 | 110 | 3000 | 3 | 3200 | 250 |
| One in 100,000,000 | 900 | 14,000 | 8 | — | 290 |
| One in 1,000,000,000 | 3300 | 45,000 | 14 | — | — |

[a] This is the predicted chance of core melt per reactor year.

TABLE 5–5  CONSEQUENCES OF REACTOR ACCIDENTS FOR VARIOUS PROBABILITIES FOR ONE REACTOR

| Chance Per Reactor-Year | Consequences | | |
|---|---|---|---|
| | Latent Cancer [b] Fatalities (per year) | Thyroid Nodules [b] (per year) | Genetic Effects [c] (per year) |
| One in 20,000 [a] | <1.0 | <1.0 | <1.0 |
| One in 1,000,000 | 170 | 1400 | 25 |
| One in 10,000,000 | 460 | 3500 | 60 |
| One in 100,000,000 | 860 | 6000 | 110 |
| One in 1,000,000,000 | 1500 | 8000 | 170 |
| Normal Incidence | 17,000 | 8000 | 8000 |

[a] This is the predicted chance of core melt per reactor year.

[b] This rate would occur approximately in the 10 to 40 year period following a potential accident.

[c] This rate would apply to the first generation born after a potential accident. Subsequent generations would experience effects at a lower rate.

TABLE 5-6   APPROXIMATE AVERAGE SOCIETAL AND INDIVIDUAL RISK PROBABILITIES PER YEAR FROM POTENTIAL NUCLEAR PLANT ACCIDENTS [a]

| Consequence | Societal | Individual |
|---|---|---|
| Early Fatalities [b] | $3 \times 10^{-3}$ | $2 \times 10^{-10}$ |
| Early Illness [b] | $2 \times 10^{-1}$ | $1 \times 10^{-8}$ |
| Latent Cancer Fatalities [c] | $7 \times 10^{-2}$/yr | $3 \times 10^{-10}$/yr |
| Thyroid Nodules [c] | $7 \times 10^{-1}$/yr | $3 \times 10^{-9}$/yr |
| Genetic Effects [d] | $1 \times 10^{-2}$/yr | $7 \times 10^{-11}$/yr |
| Property Damage ($) | $2 \times 10^{6}$ | —— |

[a] Based on 100 reactors at 68 current sites.

[b] The individual risk value is based on the 15 million people living in the general vicinity of the first 100 nuclear power plants.

[c] This value is the rate of occurrence per year for about a 30-year period following a potential accident. The individual rate is based on the total U.S. population.

[d] This value is the rate of occurrence per year for the first generation born after a potential accident; subsequent generations would experience effects at a lower rate. The individual rate is based on the total U.S. population.

TABLE 5-7   CONSEQUENCES OF REACTOR ACCIDENTS FOR VARIOUS PROBABILITIES FOR 100 REACTORS

| Chance Per Year | Consequences | | | | |
|---|---|---|---|---|---|
| | Early Fatalities | Early Illness | Total Property Damage $10^9 | Decontamination Area Square Miles | Relocation Area Square Miles |
| One in 200 [a] | <1.0 | <1.0 | <0.1 | <0.1 | <0.1 |
| One in 10,000 | <1.0 | 300 | 0.9 | 2000 | 130 |
| One in 100,000 | 110 | 300 | 3 | 3200 | 250 |
| One in 1,000,000 | 900 | 14000 | 8 | [b] | 290 |
| One in 10,000,000 | 3300 | 45000 | 14 | [b] | [b] |

[a] This is the predicted chance per year of core melt considering 100 reactors.

[b] No change from previously listed values.

TABLE 5-8   CONSEQUENCES OF REACTOR ACCIDENTS FOR VARIOUS PROBABILITIES FOR 100 REACTORS

| Chance Per Year | Consequences | | |
|---|---|---|---|
| | Latent Cancer [b] Fatalities (per year) | Thyroid Nodules [b] (per year) | Genetic Effects [c] (per year) |
| One in 200 [a] | <1.0 | <1.0 | <1.0 |
| One in 10,000 | 170 | 1400 | 25 |
| One in 100,000 | 460 | 3500 | 60 |
| One in 1,000,000 | 860 | 6000 | 110 |
| One in 10,000,000 | 1500 | 8000 | 170 |
| Normal Incidence | 17,000 | 8000 | 8000 |

[a] This is the predicted chance per year of core melt for 100 reactors.

[b] This rate would occur approximately in the 10 to 40 year period after a potential accident.

[c] This rate would apply to the first generation born after the accident. Subsequent generations would experience effects at decreasing rates.

The Reactor Safety Study contains a caveat that its estimates as to the likelihood of a core melt accident could be in error in either direction by a factor of five and that the estimates of damage from such accidents could also be substantially off the mark in either direction.

Defendants and their witnesses say further that the likelihood of a major nuclear accident is much less than the likelihood of numerous others of the "thousand jolts and shocks the flesh is heir to" (lightning, cancer, motor travel, drowning, etc.), and suggest that it is actually so small that as a practical. matter it may be disregarded.

The plaintiffs present a grimmer picture. Their experts say that the Reactor Safety Study was made in part to promote and sell the development of nuclear power and does not provide a realistic estimate of its dangers. They say, among other things, that:

(a) True evaluation of the likelihood of component failure and human failure is impossible.

(b) Not all the causes of malfunctions are known.

(c) The cooling systems being installed by Duke are really untested; they are bigger than any that have yet been tested in operation, and are different in various design features.

(d) With potential damage catastrophic, the various emergency cooling systems should be thoroughly protected and totally separate in their controls and in their use of channels for the cooling water, whereas, in fact, they use common ducts in certain places and common or closely related channels for some of the electrical controls.

(e) Possibilities of sabotage have not been adequately recognized and evaluated.

(f) The decay of efficiency and reliability caused by aging was not fully considered; the Reactor Safety Study claims to be valid only for the first five years of a reactor's life. (Defendants' witnesses testified that in fact the plant would be more safe as it grew older.)

(g) The studies made regarding the likelihood of earthquake damage are not realistic; too little is known about earthquakes to make a scientific evaluation of that subject.

(h) Unforeseen accidents do occur. A major cooling failure occurred at a reactor at Brown's Ferry, Alabama, which was caused by a fire started from a candle being used by a workman; a core melt was prevented only because a pump not designed for the purpose was able to function for several hours and prevent a melt down.

(i) Deficiencies in the Reactor Safety Study were not judged "significant" unless they would indicate a change in the overall net risks by a factor of as much as ten. This is too much tolerance for such a serious business, plaintiffs say.

The United States Environmental Protection Agency made a review (Plaintiffs' Exhibit 22) of the Reactor Safety Study, and also reached some critical conclusions about it. They pointed out that the study (1) failed to evaluate fully the adverse effects on health following an accident; (2) made unduly optimistic assumptions with regard to evacuation and remedial measures; (3) improperly or incompletely evaluated the assumptions made in determining the likelihood of accidents; and (4) did not accurately describe its analyses of the consequences of release of radioactive materials.

These and other deficiencies, according to the Environmental Protection Agency, materially affect the validity of the mathematical conclusions of the study. The Environmental Protection Agency concluded that "the study has understated the risk based on underestimated health effects, evacuation doses, and *probabilities of releases.* The range is believed to be *between a value of one and a value of several hundred."* (Emphasis added.) Id. at 1–4.

Dr. Henry W. Kendall, Professor of Physics at the Massachusetts Institute of Technology, was one of several witnesses testi-

fying for the plaintiffs. He made a partial interpretation of the Reactor Safety Study itself in a table on page 5 of his written testimony, which is reproduced below:

## TABLE

PREDICTED CONSEQUENCES OF ACCIDENTS IN COMMERCIAL LIGHT WATER REACTORS (adapted from RSS App. XI, Table 4–1)

Accident consequences, based on RSS conclusions, that are associated with reactor core melting. According to RSS, an accident with "average consequences" is likely to occur with a probability of 1 in 20,000 for each reactor, every year, and an accident with "peak consequences" with a probability of 1 in a billion for each reactor, every year.

|  | Average Consequences | Peak Consequences |
| --- | --- | --- |
| Prompt Fatalities | 0.6 | 3300 |
| Early Illness | 40 | 45,000 |
| Thyroid Nodules (a cancer) | 4,000 [1] | 240,000 [1] |
| Latent Cancer Fatalities | 400 [1] | 45,000 [1] |
| Genetic Effects | 400 [2] | 29,000 [2] |
| Property Damage | $400 million | $14 billion |
| Decontamination Area | 600 sq. miles | 2000 sq. miles |
| Relocation Area | 40 sq. miles | 290 sq. miles |
| Ground Water Contamination | [3] | [3] |

[1] Effects are assumed to extend uniformly over a 30-year period after an accident.

[2] Effects are assumed to extend uniformly over a 150-year period after an accident.

[3] Not tabulated in RSS, but, I believe, extensive. See text for further discussion.

---

Kendall expressed several opinions sharply challenging the bland conclusions of the Reactor Safety Study. Among other things, he said:

(a) Contamination of the Catawba River could result from a core melt at any of the four reactors under consideration, and would be a high probability in all core melt accidents. This could contaminate drinking water for many thousands of people.

(b) The possibility that one of the four Duke reactors might melt during the 160-odd reactor-years that they might be in service was as much as 4% (R.p. 24).

(c) Among the one hundred reactors laid on for completion in the United States by 1985, the probability of a meltdown involving at least one of those reactors during their normal 40-year lives is between 20% and 80% (R.pp. 26–27).

Dr. Kendall further testified that, taking the study at face value: (1) There is a 2% chance that during the combined service life (160 years) of the four reactors under study (R.p. 24), there will be a nuclear accident with major consequences; and (2) There is about one chance in five years of a melt down among 100 reactors during the normal life of those reactors (R.p. 26).

Kendall expressed the opinion that, because of the errors and misjudgments which he pointed out, the study's estimates of the likelihood of a core melt were too hopeful by a factor of something like ten to one and that the chance that a single reactor might melt during its own individual forty years of service life was somewhere between 1% and 10%. In another statement (R.p. 46), Kendall indicated that the study might have underestimated the probability of a melting accident with major consequences by factors that might vary between ten times and sixty times!

Dr. Kendall and Robert D. Pollard both testified that in various detailed ways the Reactor Safety Study was unduly optimistic; that it did not evaluate the effects of aging and wear and tear on controls and piping and other machinery; that it only purported to cover the first five years of the life of each reactor; that it did not truly evaluate possibilities of earthquakes and sabotage; that only a few of the possible accident sequences had really been thoroughly evaluated; that some of the stand-

by mechanisms were not independent in operation but relied upon common ducts for the handling of water and upon controls which were too closely situated to permit a complete independence of the operation of the emergency cooling systems. (The witness Saul Levine, testifying for the Nuclear Regulatory Commission, conceded that in the Reactor Safety Study there had been some 130,000 possible accident sequences discovered, but that for purposes of the study they had narrowed those accident sequences down to ten, which are considered to be the most likely.)

The Reactor Safety Study was prepared for the Nuclear Regulatory Commission and under its supervision. Of the 140 people who took part, the study indicates that only ten were employees of the Nuclear Regulatory Commission; the rest were called in from private industry and laboratories and consulting firms.

The tenor of the study is more that of a lawyer's brief than of a detached scientific analysis of risks. It is not signed by any responsible person. However, it is prefaced by the following legend, which is the only printing on the inside cover:

---

**NOTICE**

This report was prepared as an account of work sponsored by the United States Government. Neither the United States nor the United States Nuclear Regulatory Commission, nor any of their employees, nor any of their contractors, subcontractors, or their employees, makes any warranty, express or implied, nor assumes any legal liability or responsibility for the accuracy, completeness or usefulness of any information, apparatus, product or process disclosed, nor represents that its use would not infringe privately owned rights.

---

It is of record that throughout the world there had been three hundred or more reactor years of actual operation of nuclear reactors to produce power in public power plants and that none of the plants has yet sustained a core melt nor produced any major damage outside the property of the power company.

## CONCLUSIONS AS TO THE LIKELIHOOD AND CONSEQUENCES OF A MAJOR NUCLEAR ACCIDENT

The court finds as a fact that the probability of a major nuclear accident producing damages exceeding the $560,000,000 limit of the Price-Anderson Act is not fanciful but real. It is the kind of risk against which prudent business people guard, by trying to design and build safely *and* by reserves or insurance against possible losses and liability to others.

It is not the kind of risk which responsible government or business places upon bystanders.

Plaintiffs have no source from which they can get insurance against loss or damage from atomic radiation; insurance companies, regardless of the odds, won't write policies to cover such losses.

The court is not a bookie.

This case can concern itself too much with the mathematical odds for or against a particular nuclear catastrophe of a particular dimension. The question is not whether a nuclear catastrophe (at two hundred to one or twenty thousand to one) is more or less likely than a tornado, an earthquake or a collision with a comet; the significant conclusion is that under the odds quoted by either side, a nuclear catastrophe is a real, not fanciful, possibility.

The court finds, without being as rosily optimistic as the Reactor Safety Study nor as pessimistic as Dr. Kendall, that a core melt at McGuire or Catawba can reasonably be expected to produce hundreds or thousands of fatalities, numerous illnesses, genetic effects of unpredictable degree and nature for succeeding generations, thyroid ailments and cancers in numerous people, damage to other life and widespread damage to property. Areas as large as several thousand square miles might be contaminated and require evacuation. Since life of individual human beings, as shown in a number of publicized cases involving death or disability, is now being valued in some cases at sums greatly exceeding a million dollars, it would not require death of or

serious injury to many people to exceed the $560,000,000 Price-Anderson Act limitation now in effect. Nor, in a day when failure of an earthen dam in sparsely populated Idaho can produce property damage reported by the press at about a billion dollars, is it unreasonable to conclude, as I do, that radioactive pollution of a few hundred square miles of heavily populated Piedmont North Carolina or South Carolina could well produce property damage vastly exceeding the Price-Anderson ceiling.

## BUT FOR THE PRICE–ANDERSON ACT, THE NUCLEAR PLANTS WOULD NOT BE BUILT NOR OPERATED

Testimony before the 1956-57 hearings of the Joint Committee on Atomic Energy, United States Congress, indicates that the Price-Anderson Act's limitation on liability, or its equivalent, was a condition precedent to atomic power plants.

Sober corporate managers were unwilling to equip or operate nuclear plants without assurance that someone besides their stockholders would run the major risks.

Pertinent 1956–57 evidence includes statements as follows (from plaintiffs' exhibit 14):

R. T. Schacht, General Manager of Consumer Public Power District, Columbia, Nebraska:

"[A]dequate insurance at reasonable cost could be a major obstacle in the construction and operation of power reactors by anyone other than the Federal Government. The matter of protection against accidents and failures in the nuclear portion of a plant looms as the largest obstacle."

Elmer T. Lindseth, President, Cleveland Electric Illuminating Co., and Member, Edison Electric Institute Committee on Atomic Power:

"[A] formidable roadblock in the path of nuclear power development by private industry will result unless participants in the atomic program will be able to obtain insurance or indemnity protection in what may be termed adequate amounts to cover potential accidents, [however remote]."

Charles H. Weaver, Vice President of Westinghouse Electric Corp.:

"[I]t appears to be virtually unanimously agreed that a legislative solution to the public liability problem is necessary if one of the principal purposes of the act—'to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes'—is to be possible.

\* \* \* \* \* \*

"[I]f the financial protection needed is not reasonably available, *we will not be able to go ahead* with the Westinghouse testing reactor [at Waltz Mill, Pa.]" (Emphasis added.)

Lewis L. Strauss, Chairman of the Atomic Energy Commission:

"No single thing that your committee might do could contribute so greatly to the acceleration of nuclear power development in the United States as would early and favorable action on this subject [liability for nuclear accidents]."

Francis K. McCune, Vice President, General Electric Company:

"At present I see no alternative but to recommend that work on the Dresden station be halted as soon as practicable after the end of this session of Congress in case appropriate legislation has not been passed by that time. Also, as I now see it, it is my view that General Electric should not take on any other comparable project if it appears that appropriate legislation will not be passed."

The situation was only slightly different in September 1975. Testifying in favor of the renewal of the Price-Anderson Act, witnesses said:

Testimony of John W. Simpson, Chairman, Atomic Industrial Forum:

"[S]uppliers of nuclear system components like pumps or valves who have a small economic stake in the nuclear business will probably remain unwilling or reluctant to undertake new projects if their risks are not constrained. In addi-

tion, financing for new projects, already a difficult matter because of general economic conditions, will be more expensive, if available at all, without Price-Anderson protection."

Hubert H. Nexon, representing Edison Electric Institute:

"[I]n 1957 when Price-Anderson was first passed . . . no utility would undertake construction of a nuclear plant without the protection this statute afforded.

\* \* \* \* \* \*

"In any event, utilities are not free to decide as they please the question of whether to build nuclear plants. It is entirely likely that whether or not utilities are willing to proceed, expiration of Price-Anderson would leave them unable to do so or make going forward much more difficult.

"[S]ome vendors of nuclear steam supply systems may be unwilling to proceed without Price-Anderson protection.

"In the past, proposals for nuclear steam supply systems have been conditioned on the availability of Price-Anderson protection. Whether the vendors will be willing to proceed without it is not yet clear.

"As Mr. Simpson, observed, there are many suppliers of nuclear system components, such as pumps, seals, or valves, who have a relatively small economic stake in the nuclear business, but who would be exposed by law, absent Price-Anderson, to the same order of risk as power-plant operators and major vendors.

"In the past, such suppliers have frequently asked for inclusion of provisions with respect to Price-Anderson protection in their contracts.

"Architect-engineers, with a large potential liability, nevertheless have a rather narrow economic base, and I am informed that often they have also insisted on Price-Anderson protection.

"[I]t is not at all clear what the expiration of Price-Anderson will do to the ability of utilities who plan nuclear plants to raise capital.

"Certainly, all electric utilities have found it increasingly difficult to compete in the money market. Failure to extend Price-Anderson is very likely to increase these difficulties."

Testimony of Morgan D. Dubrow, National Rural Electric Cooperative Association:

"NRECA anticipates that the expiration of this nuclear liability insurance would result in serious difficulties and perhaps preclude any utilities efforts to obtain the necessary regulatory authority and adequate financing."

Testimony of Lawrence S. Hobart, American Public Power Association:

"For instance, the Sacramento Municipal Utility District, which is now considering construction of a second nuclear unit, reported last year that:

'SMUD has already found that engineering and manufacturers are requiring cancellation options in their contractual relationships with utilities should new nuclear facilities not receive construction permits prior to August 1, 1977, unless satisfactory financial indemnification legislation be in effect at that time.'"

Statement of Harry O. Reinsch, President, Bechtel Power Corporation ("major engineer-contractor of nuclear power plants") dated September 23, 1975:

"In the event that the protection afforded by Price-Anderson is allowed to lapse, we envision additional problems which could jeopardize the further development of nuclear power in this country. For example, there are a considerable number of companies whose goods and services are essential to the nuclear power industry. But because of small size or limited resources they would find that the exposure to a potentially large liability was completely out of proportion to their resources. Consequently, they would be obliged to withdraw from the nuclear supply business. Further, any small or medium size companies seeking to broaden their scope would find the nuclear field essentially closed to them. Additionally, some utilities may conclude that

the resulting unlimited liability would affect their financial rating to such an extent that construction and operation of additional nuclear plants would not be prudent."

Telegram from T. E. Bennett, Vice President of Ingersoll-Rand Co.:

"In the absence of a finite limit of liability provided to us by either the public or private sector under a suitable omnibus clause, Ingersoll-Rand would find it necessary to withdraw from supplying such key components for nuclear power plants."

Letter from Fred R. Rippy, President of Fred R. Rippy, Inc. ("supplier to Babcock & Wilcox of very minute parts that go into nuclear power plants"), dated September 26, 1975:

"Since we would not be able to protect ourselves with insurance [in the event that Price-Anderson is not extended], we would probably not be willing to bid on this type of work, even though we are, to our knowledge, a sole supplier and one of the few with our particular capability in the United States."

Discussion paper from Atomic Industrial Forum:

" . . . The first could be the cessation of nuclear business by a number of suppliers of components for whom the nuclear business is but a small portion of their total business activity. . . .
As to operating utilities, some have indicated that they would continue to order nuclear power plants even without this legislation. Whether they would in fact have the ability to do so would depend to large extent on their financial situation."

Letter from Duke Power Company to Joint Committee on Atomic Energy, *Hearings before Joint Committee on Atomic Energy*, on H.R. 8631:

"Duke Power is an electric utility providing about 2½ percent of the nation's electric power to over one million customers in the Piedmont section of North and South Carolina. Recognizing nuclear power's substantial savings to consumers, Duke Power's commitment to commercial nuclear power began in 1966. Today, the company has three nuclear generating units in service, four more under construction, and six more for which applications have been filed for construction permits.

"Because of risks as perceived by others, passage of HR 8631 to extend the Price-Anderson Act for ten years is necessary if nuclear power is to play its essential role in meeting our nation's energy needs. As a nuclear utility, we rely upon others to supply equipment and materials and to supply capital for our nuclear plants. It matters little that we feel that nuclear power without Price-Anderson would still provide enormous benefits to the public far outweighing the infinitesimal risk to them. It is important how *our suppliers and investors* perceive risks to them from nuclear power. Perhaps influenced by the scare stories from nuclear opponents, they *need the assurance of Price-Anderson if they are to supply equipment and capital at a reasonable price, or at all.* (Emphasis added.)

"A major supplier has included a provision in his proposed contract that if the nuclear unit is not covered by an extension to Price-Anderson, the contract shall be cancelled and we shall reimburse the supplier for all his costs plus a reasonable profit thereon. Another supplier of medium sized, but important equipment, has advised that if Price-Anderson is not extended, that he will no longer supply the nuclear industry, but concentrate on his other markets. There are only a very few suppliers of his line of equipment, and his loss would reduce competition, thus hurting the consumer since higher plant costs must be recovered through electric rates. Small suppliers and businessmen who sell only a few thousand dollars worth of materials and services for a multi-million dollar nuclear plant ask to be indemnified under Price-Anderson coverage to protect them against third party claims that they perceive in enormous amounts compared to their small nuclear-related sales volume.

"Meeting our nation's energy needs will continue to require very large amounts of new capital. This will only be provided by confident investors. Failure to extend Price-Anderson could well cause some erosion of this confidence, resulting in higher cost of capital and/or inadequate supply. Such a consequence would only add to the consumer's economic burden."

Letter from W. M. Vannoy, Group Vice President, Power Generation Group, Babcock & Wilcox, dated March 20, 1974:

"The possibility of material change in the protection now afforded by the provisions of the Price-Anderson has caused us, as trustees for our stockholders, to include suitable protection clauses in new proposals. Also, in the event of unfavorable congressional action, we may well be forced to reconsider our role in the nuclear industry."

The testimony of Mr. W. S. Lee, Vice President of Duke, at the hearing in September, 1976, as to whether he thought Duke would proceed with nuclear plant construction and operation without Price-Anderson, was as follows:

"We would attempt to. A decision as to whether to proceed without the Act would depend upon a weighing of what we know about nuclear power compared to how others perceive nuclear power. From what I know about nuclear power, it would be my recommendation that Duke proceed even in the absence of Price-Anderson. However, from the point of view of how others perceive nuclear power, there is some question about whether it would be a practical undertaking in the absence of the Act. To build any type power plant requires that we raise capital by selling new securities in the marketplace to thousands of willing, volunteer investors. Also, to build any type power plant requires materials, equipment and services to be supplied by hundreds of suppliers, both large and small. Whereas my study and experience gives me great confidence in the safety of nuclear power, and I say this after careful consideration of the questions raised by these plaintiffs as well as other critics, a member of the general public cannot be expected to view this complex subject in the same manner. This is especially true with today's publicity of questions surrounding nuclear power safety. The hundreds of suppliers that furnish components like bolts or wires to our quality specifications where the supplier may not be aware of the ends use of his product. [Sic.] He doesn't have to be well informed about nuclear safety to sell his product. Yet, I understand why he does not want to be exposed to a risk that he may perceive. I have already been advised by several firms that the existence of Price-Anderson is required for them to be a supplier to our nuclear program. It is important that we have a number of qualified suppliers to provide competition for the thousands of components required to build the plant. If Price-Anderson did not exist, I would therefore have to evaluate the extent to which its absence caused disappearance of suppliers from the marketplace in arriving at my recommendation."

Without the protection of the Price-Anderson Act, regardless of the desires of the nuclear power industry, power companies would probably not be able to obtain the necessary financing, supplies, and architectural skills to build nuclear power plants and to maintain them once construction was complete.

## PLAINTIFFS HAVE STANDING TO SUE

Defendants assert that plaintiffs have no standing to bring this action to test the constitutionality of the Price-Anderson Act. They also assert that there is no live "case" or "controversy" to support federal jurisdiction.

Standing, in simple terms, is a requirement that the plaintiffs have been injured or be threatened with injury by the governmental action complained of. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967), held that taxpayers challenging the spending of federal funds in

violation of the "establishment" and free exercise clauses of the First Amendment were entitled to maintain the suit, even though their share of the taxes lost was no more proportionately than the share of other taxpayers. They had, the Court said, established (a) a logical link between their status as taxpayers and the law under attack, and (b) a connection between their status as taxpayers and the precise nature of the constitutional violation, which must be a violation of a specific constitutional protection against abuse of legislative power. They had, according to the Court, alleged

"the (gist of the question of standing)"; that is (392 U.S. at 99, 88 S.Ct. at 1952), they had

"alleged *such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon* which the Court so largely depends for illumination of difficult constitutional questions." (Emphasis added.)

citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

"Standing" focuses upon the litigant and raises the question whether the litigant is the proper party to fight the lawsuit, not the question whether the issue itself is justiciable.

*Arlington Heights v. Metropolitan Housing Development Corp. et al.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), is of current relevance. The Court upheld the right of a real estate development corporation and a probable tenant to challenge a municipality's refusal to rezone a lot in order to make it possible to build apartments for probable occupancy by blacks and Mexican Americans in a restricted neighborhood. Mr. Justice Powell, writing for the majority, made several comments on the question of standing:

" . . . When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy. MHDC has shown an

injury to itself that is 'likely to be redressed by a favorable decision.' *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. [26,] at 38 [96 S.Ct. 1917, 48 L.Ed.2d 450.]" 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450.

\* \* \* \* \* \*

"The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a *'substantial probability,' Warth v. Seldin*, 422 U.S. [490,] at 504 [95 S.Ct. 2197, 45 L.Ed.2d 343], that the Lincoln Green project will materialize, affording Ransom the housing opportunity he desires in Arlington Heights. His is not a generalized grievance. Instead, as we suggested in *Warth, id.*, at 507, 508 n. 18 [95 S.Ct. 2197], it focuses on a particular project and is *not dependent on speculation about the possible actions of third parties not before the court.* See *id.*, at 505 [95 S.Ct. 2197]; *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. at 41–42 [96 S.Ct. 1917.] Unlike the individual plaintiffs in *Warth*, Ransom has adequately averred an 'actionable causal relationship' between Arlington Heights' zoning practices and his asserted injury. *Warth v. Seldin*, 422 U.S., at 507 [95 S.Ct. 2197.] We therefore proceed to the merits." 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 [Emphasis added.]

Standing is dependent on the facts. Facts of this particular case bearing on standing include these:

(a) The nuclear reactor-turbine plants would not be under construction and are not likely to operate without the guaranty of limited liability provided by the Price-Anderson Act. There is a "but for" causal connection between the Act and the construction of the nuclear plants which the plaintiffs view as a threat to them. The fact that insurance or indemnity *might* have been made available, or might yet be made available in some other fashion, does not prevent the Price-Anderson Act from being causally connected

with the construction; the agency which provides the financial security for the stockholders is, in fact, the Price-Anderson Act, and it thereby becomes a "but for" cause of the construction.

In addition, there is a substantial likelihood that Duke would not be able to complete the construction and maintain the operation of the McGuire and Catawba Nuclear Plants but for the protection provided by the Price-Anderson Act.

(b) Operation of the plants will cause *present and certain* injury to the plaintiffs. It will release a small but regular amount of radioactive energy at all times following the start-up of the nuclear reactor. This radioactive matter will add measurably to the radioactivity in the air and water and land in the neighborhood of the plant. These radioactive emissions will invade the air and water and the bodies and genes of plaintiffs and others in the neighborhood. The long term results of adding radiation in these quantities are estimated to be slight; however, since nuclear physics is a relatively recent science and the experimental data is scanty, there is no way to tell short of a few generations what this unwanted and unintended radioactive invasion of the air, ground and water will do to human and other beings.

(c) Plant operation will produce a substantial increase in the temperature of the waters of the lake. This increase in temperature will disturb the balance of animal and plant life; will increase the growth of algae and various types of plants; and will affect the breeding and feeding and migration habits of fish. It will produce favorable conditions for certain types of fish, especially in cold weather, but unfavorable conditions for some more desirable types of fish. The heat will also detract from the recreational value of the lake.

(d) The threat and present fear of future catastrophic accidents is real and objectively reasonable. Though no true *atomic explosion* can occur in a nuclear power plant, nevertheless, there is the real possibility that an accident can occur which will breach the containment building and distribute radioactive poison over wide areas and cause wholesale illnesses, cancers, thyroid ailments, genetic injuries and deaths, and major property damage. The full effects of such radiation, whether great or acute, on humans and on milk and other foods and on property can be accurately determined only by experience.

(e) There is the possibility, estimated by witnesses at from one chance in millions to one chance in a few score that the cooling system will fail and that the reactor core will melt and rupture the containment building and discharge *large* quantities of contaminants over a *wide* area. If such a melt-down accident occurred it could eventually poison the air for thousands, and the Catawba River for long distances, thereby indefinitely polluting the water supply for many thousands of people.

(f) Some of the plaintiffs live within a half mile or less of a reactor site; one has moved away from the site because of the construction of the plant.

(g) Charlotte is twelve to fifteen miles in diameter; it is only seventeen miles southeast from the McGuire plant and sixteen miles or so northeast from the Catawba plant and, thus, is a different direction from each; and the winds in these parts, like the winds in most places, are variable. More significantly, however, the evidence shows that Charlotte is not the only possible target; both of these plants are so located that regardless of which way the wind blows, it blows towards many thousands of people.

(h) Recoveries in cases of injury to and death of a human being have been known in recent years to exceed a million dollars and more. Without even considering property damage, it appears that death or major injuries to 500 or 1,000 people could produce legitimate losses vastly exceeding $560,000,000.

It thus appears that the plaintiffs and the class they represent have a present interest in the construction of the plant; they will

suffer a small amount of chronic damage when the operation of the plant begins and they presently have an apprehension, which is objectively reasonable in nature, that future and perhaps major damage may be caused by uncontrollable leaks or ruptures of the containment devices. They as plaintiffs have a live and personal stake in provision for financial responsibility for undesired effects if all safeguards fail.

## THIS IS A LIVE CONTROVERSY RIPE FOR DECISION

■ Plaintiffs in this action suffer two kinds of injuries. First is the present everyday injury through heat and radiation of living in proximity to an operating nuclear power plant. The second is the reasonable possibility that there will be a nuclear accident that will cause them injury for which they will not be fully compensated as a result of the liability limit of the Price-Anderson Act.

■ The unwanted and compelled present exposure to increase of radioactive contamination, the heating of the lakes, and the threat of having to make the Hobson's choice of moving away or living with a constant and present fear of future catastrophe are themselves injuries which give rise to an immediate right of action for redress. Under the law of North Carolina a right of action arises as soon as a wrongful act has created "any injury, however slight," to the plaintiff. *Sellers v. Friedrich Refrigerators, Inc.*, 283 N.C. 79, 82, 194 S.E.2d 817 (1973); *Jewell v. Price*, 264 N.C. 459, 142 S.E.2d 1 (1965); *Thurston Motor Lines v. General Motors Corp.*, 258 N.C. 323, 128 S.E.2d 413 (1962). After the cause of action accrues, if a suit is not brought within the time limitation set by statute, such a suit will be barred. North Carolina General Statutes § 1–15(a). Not only is plaintiffs' action ripe, but also, if plaintiffs did not bring the suit within three years after the injury began, their action might be barred.

Plaintiffs' exposure to injury from a nuclear accident for which the Price-Anderson Act will prevent full compensation is not a certainty but it is much greater than a fanciful possibility. The possibility of this taking, comparable to the "erosion taking" dealt with in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), even without the certain present injuries described above, establishes the ripeness of this action.

The *Regional Rail Reorganization Act Cases, supra,* appear to be pertinent. Congress enacted a law authorizing eight major railroads to continue to operate under court supervision under Section 77 of the Bankruptcy Act. Plaintiffs, owners of interests in Penn Central, attacked the constitutionality of the statute, contending that it took property without just compensation, asserting that the securities offered them in exchange were not a *quid pro quo* and that the compulsory operation of the railroads would erode their equity in Penn Central (this was called "erosion taking"). The district court entertained the "erosion taking" issue, said it was not premature, said that the constitutionality of the Act should be dealt with on its merits, and ruled that the Tucker Act in the context was unconstitutional. The issue was "ripe" for adjudication. The Supreme Court, agreeing as to "ripeness," said, in pertinent part:

" . . . It is therefore reasonable to conclude that compelled continued rail operations under these conditions pending implementation of the Final System Plan *may* accelerate erosion of the interests of plaintiffs below through accrual of post-bankruptcy claims having priority over their claims. Thus, failure to decide the availability of the Tucker Act would raise the distinct *possibility* that those plaintiffs would suffer an 'erosion taking' *without adequate assurance that compensation will ever be provided. Yet there must be at the time of taking 'reasonable, certain and adequate provision for obtaining compensation.'* Cherokee Nation v. Southern Kansas R. Co., 135 U.S. 641, 659 [10 S.Ct. 965, 34 L.Ed. 295] (1890); see also *Joslin Mfg. Co. v. City of Providence*, 262 U.S. 668, 677 [43 S.Ct. 684, 67 L.Ed. 1167] (1923); *United States v. Dow*, 357 U.S. 17, 21 [78 S.Ct. 1039, 2 L.Ed.2d 1109] (1958). Therefore we must deter-

mine if the Tucker Act is available." (Emphasis added.) 419 U.S. 102, 124–25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974).

The "erosion taking" of the *Regional Rail Reorganization Act Cases* was far from a certainty. It was only to happen if the Final System Plan was not implemented within a reasonable time. Furthermore, only events unforeseen and unanticipated would cause the delay.

There is a distinct possibility in this case, as in the *Regional Rail Reorganization Act Cases*, that plaintiffs will suffer a taking without assurance that compensation will be provided.

The plaintiffs are directly, immediately and personally interested in the event; they allege and have shown that they will be immediately injured when the plant starts operating; there is a real possibility that the injury may become catastrophic; they are faced with probable and possible injuries without "reasonable, certain and adequate provision for obtaining compensation," which the *Regional Rail Reorganization Act Cases* properly required.

Plaintiffs have shown that the Price-Anderson Act has been an indispensable element—a "but for" cause—of the construction of atomic power plants and their threatened operation, and that without the Price-Anderson Act, either there would be no nuclear plants or there would be insurance or other security to cover their threatened losses; they are entitled to challenge the Price-Anderson Act on its merits.

### THE PRICE–ANDERSON ACT IS UNCONSTITUTIONAL

The Price-Anderson Act limits the total liability for a single nuclear incident, including defense costs, to $560,000,000; it establishes a claim handling procedure which contemplates that the entire problem of adjusting claims will be dumped in the lap of a cognizant United States District Judge if it looks as though losses may exceed the liability limits; payments beyond 15% of the limit ($84,000,000) may not be made without court approval; such payments above $84,000,000 must be made pursuant to a "plan of distribution" (or found by a court not to interfere with a future plan); claims for later and future injuries must be provided for and decided by the judge; some such claims may not mature for several decades, and in the meantime uncertainties will cloud settlement of fully matured claims.

For a number of reasons, the Price-Anderson Act violates the Equal Protection and Due Process provisions of the Fifth Amendment to the United States Constitution.

### DUE PROCESS

The Act violates the Due Process Clause because it allows the destruction of the property or the lives of those affected by nuclear catastrophe without reasonable certainty that the victims will be justly compensated. Considerations that lead to this conclusion include the following:

1. The amount of recovery is not rationally related to the potential losses. Abundant evidence in the record shows that although major catastrophe in any particular place is not certain and may not be extremely likely, nevertheless, in the territory where these plants are located, damage to life and property for this and future generations could well be many, many times the limit which the law places on liability.

2. The Act tends to encourage irresponsibility in matters of safety and environmental protection rather than to encourage responsibility on the part of builders and owners. This is contrary to the purpose of the Atomic Energy Act, which declares the policy of the United States to encourage "widespread participation in the development and utilization of atomic energy for peaceful purposes *to the maximum extent consistent with the common defense and security and with the health and safety of the public.*" 42 U.S.C. § 2013(d). (Emphasis added.) It is true that power companies have other incentives to build carefully, because a core melt down or other major disruption of a nuclear steam generator would be a devastating blow to the treasuries of even the largest power companies

such as Duke. Nevertheless, when a low ceiling is placed on accountability to the public, the *tendency* of such low ceiling is to diminish rather than to heighten steps necessary to protect the public and the environment.

3. There is no *quid pro quo*. The defendants contend that the limitation of liability is justified by an exchange of burdens and benefits, and that although there may be a limit on recovery, this is compensated for by certainty of· recovery, prompt release of funds, extension of [some] short statutes of limitation, and elimination of some theoretical defenses. They cite as authority workmen's compensation acts (*New York Central Railroad v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917)); longshoremen's acts (*Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932)); the Warsaw Convention (limiting liability for death in international air traffic) (*Indemnity Insurance Company of North America v. Pan American Airways,* 58 F.Supp. 338 (S.D.N.Y.1944)), and others. These authorities do not support the Price-Anderson Act. The reasons, among others, are these:

(a) Those who operate nuclear reactors give up nothing of consequence when they waive defenses of negligence, contributory negligence, assumption of risk and governmental or charitable immunity. Assumption of risk and contributory negligence do not bar a citizen from recovery for damage caused by trespassing radioactivity. Power companies don't have governmental or charitable immunity. Under the law of North Carolina, for example (and I understand it to be essentially like that of other states), people who handle highly explosive or dangerous substances are liable to others for damages caused thereby, even in the absence of traditional negligence. The principle goes back to the British case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), which held the owner of the dam liable to downstream landowners whose property was damaged when the dam burst.

The courts of North Carolina have adopted the principle of *Rylands v. Fletcher* and hold those who engage in ultra-hazardous activities to a standard of strict liability. North Carolina law has been used to impose liability without proof of any negligence on those engaged in rock blasting, *Guilford Realty v. Blyth,* 260 N.C. 69, 131 S.E.2d 900 (1963); on those engaged in quarrying rock, *Paris v. Carolina Portable Aggregates, Inc.,* 271 N.C. 471, 157 S.E.2d 131 (1967); and on those who fly airplanes at supersonic speeds causing sonic booms, *Nelms v. Laird,* 442 F.2d 1163 (4th Cir. 1971), rev'd on other grounds, *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

The courts of North Carolina have not yet had the chance to apply the rule of strict liability to nuclear power plants. However, the considerations that have led to the application of strict liability are all present in the generation of nuclear energy. It is an intrinsically ultra-hazardous activity, and, when done near large population centers, it is "impossible to predict with certainty the extent or severity of its consequences." *Trull v. Carolina-Virginia Well Company,* 264 N.C. 687, 691, 142 S.E.2d 622, 624 (1965).

The philosophy behind the imposition of strict liability is that "[t]he law casts the risk of the venture on the person who introduces peril into the community. Blasting operations are dangerous and should pay their own way." *Trull v. Carolina-Virginia Well Co.,* 264 N.C. at 691, 142 S.E.2d at 624. This allocation of risk is applicable to the generation of nuclear energy as it is to blasting.

The doctrine of strict liability for abnormally dangerous conditions and activities is discussed in Prosser, *The Law of Torts* (4th Ed. 1971), at pp. 505–516. In that section Prosser concludes:

"Although rockets already have made their appearance in the field of strict liability, the first case raising the question as to the use of nuclear energy has yet to reach the courts. When it does, it may be predicted with a good deal of confidence that *this is an area in which no court will, at last, refuse to ·ecognize*

*and apply the principle of strict liability found in the cases which follow Rylands v. Fletcher."* (Emphasis added.) Id. at 516.

Thus, in case of nuclear catastrophe, giving up the requirement that plaintiffs prove negligence is giving up nothing of substantial value.

(b) An airline passenger or a shipper of freight does in theory have an option; he can stay home or travel or ship by other means; there is some basis to justify the limitation on liability when he puts his own body or his property aboard the conveyance. By contrast, the neighbor of a nuclear power plant, or the person caught by chance in the contaminated area, has no option at all.

(c) Prompt release of funds without prolonged litigation is *not* afforded. The Act promotes *uncertainty* rather than certainty and delay rather than promptness in the settlement of claims. Once settlements pass a total of $84,000,000 (15% of the ceiling), payments stop and the whole problem is referred to a nearby district judge. Thereafter, claims can not be settled on their own merits, but must be settled in terms of a "proportion" of the available funds. These settlements have to be partial or contingent for times that may extend into decades in order to comply with the Act's provision for reserves for late developing claims or lately discovered damage. Since later generations may be involved in such claims, the one thing certain about this procedure is uncertainty.

(d) Unlike claims under workmen's compensation and the Warsaw Convention, the amounts of the potential small recoveries allowed by the Price-Anderson Act are not even certain; since the maximum total liability does not vary with the number of people injured, the recoveries must be simply *proportions* of the fund, bearing more relationship to the number of people injured than to the severity of the injury of the individual.

(e) The Warsaw Convention was a *treaty* rather than an Act of Congress; treaties with other nations don't follow the same rules as lawsuits or ordinary Acts of Congress. Moreover, plaintiffs point out that the United States in 1965 denounced the Warsaw Convention and resumed endorsement of it a year later only after agreement was reached sharply increasing liability to United States passengers to $75,000 instead of the $8,500 which had theretofore obtained.

(f) The omnibus nature of the coverage (providing payments for injuries caused by even financially irresponsible wrong-doers) is not a redeeming feature; omnibus coverage could be provided under a fair plan just as well as under this unfair plan.

(g) Waiver of [some] short statutes of limitations affects only the *time when the potential remedy can be asserted by suit and does not affect the fairness of the underlying right.* Many statutes of limitations, see, for example, North Carolina General Statutes § 1–15(b), already provide for tolling of rights of action where damage is hidden or not discovered until later.

(h) A further problem with Price-Anderson is that the limit is absolute and applies to nuclear catastrophe even though it may be the result of wilful conduct or gross negligence.

(i) It was argued orally that in the event of a nuclear catastrophe, somebody by executive action or Congress by special Act under the 1975 proviso to § 2210(e) *might* make some "relief" immediately available. Mr. Micawber would like that idea. It may well be so, and I hope it would be. However, the fact that a future Congress might be more generous than past Congresses have been wise would still leave the Price-Anderson Act short of providing the "reasonable, certain and adequate provision for obtaining compensation" which due process of law requires. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 124–25, 95 S.Ct. 335, 42 L.Ed.2d 320; *Cherokee National v. Southern Kansas Railroad Company,* 135 U.S. 641, 659, 10 S.Ct. 965, 34 L.Ed. 295 (1890).

## EQUAL PROTECTION

The Act violates the equal protection provision that is included within the

Due Process Clause of the Fifth Amendment because it provides for what Congress deemed to be a benefit to the whole society (the encouragement of the generation of nuclear power), but places the cost of that benefit on an arbitrarily chosen segment of society, those injured by nuclear catastrophe. This conclusion is reached by considering the reasons that lead to the holding that the Act violates the Due Process Clause, plus the following:

1. The statute irrationally places the risk of major nuclear accident upon people who happen to live in the areas which may be touched by radioactive debris. No necessity is suggested for using such geographical happenstance as the basis for allocating the burden of loss.

2. The Act irrationally and unreasonably places a greater burden upon people damaged by nuclear accident than upon people damaged by other types of accidents, such as motor vehicle or electrical accidents, involving power companies.

3. The Act unreasonably and irrationally relieves the owners of power plants of financial responsibility for nuclear accidents and places that loss upon the people injured by such accidents who are by definition least able to stand such losses.

4. The limitation is unnecessary to serve any legitimate public purpose. Other arrangements rationally related to the interests asserted could easily be devised. For example, a liability pool could be established, requiring either contributions in advance, or liability for assessment on a unit basis or otherwise, of all power companies building or operating nuclear generators. This would effectively place the responsibility upon the group most directly profiting from any improvement in the costs or usefulness of electric power—the power company stockholders and the customers themselves. Another rational alternative would be to make such accidents a national loss and to pay those damaged out of the federal treasury. This would spread the loss among those who benefitted indirectly by having the nation's power supply increased as well as among those who presumably benefitted directly.

No federal case in point on the equal protection issue has been cited. Perhaps Congress has never before (without compensating factors absent here) passed a law placing the potential burden of major industrial catastrophes solely upon the victims of such catastrophes.

Two state supreme courts have, however, considered statutory efforts to limit recovery for damages for medical malpractice, and have based their holdings on reasoning similar to that employed here. *Wright v. Central DuPage Hospital Ass'n.*, 63 Ill.2d 313, 347 N.E.2d 736 (Illinois Supreme Court 1976) ($500,000 limit invalid); *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (Idaho Supreme Court 1976) ($150,000 limitation; remanded for further consideration of the facts in light of the principles articulated).

Perhaps if the presumed stakes were not so high, the correctness of those decisions would be obvious to all the litigants here.

---

Some of the witnesses so minimized the risks of nuclear power plants that the court is tempted to forget the evidence to the contrary and to conclude that there are no major dangers, and to say, like Pollyanna, that "everything will turn out all right." That temptation subsides in light of the strong evidence that the dangers are real, and when it is remembered that the Price-Anderson Act was sold to Congress in 1956 and re-sold in 1975 by government and industry spokesmen as being necessary to induce power companies and investors to build atomic power plants. In those days, they sought the Price-Anderson Act's limitation on liability upon a practical premise more consistent with Robert Burns' classic thought that

"The best laid schemes o' mice an' men
Gang aft agley
An' leave us nought but grief an' pain
For promised joy."

**226**

CONCLUSION

Plaintiffs are threatened with certain injury of relatively minor nature, and with the reasonable likelihood of major and perhaps catastrophic injury, without assurance of adequate compensation if that should occur. But for the limitation of the Price-Anderson Act, the nuclear power plants would not be being built and those threats would not exist. Plaintiffs are actively pursuing the case. They have a live stake in the controversy and are sufficiently aroused that their position has been well and adequately presented. A live case or controversy exists; they have standing; the issue is ripe for decision and there is no need to wait until a reactor accident occurs before deciding the case. The time to put on the roof is before it starts raining. The question of the constitutionality of the Price-Anderson Act should be decided now.

Injunctive relief is not sought and is not contemplated; at the time this action was filed one federal district judge had no authority without the concurrence of one of two other judges to issue an injunction based upon the unconstitutionality of an Act of Congress.

The question is, however, whether or not to declare the constitutional rights of the parties.

Granting declaratory relief in this case is not likely to interrupt the operation of the statutory scheme before the parties can seek to have the Supreme Court finally adjudicate the issue. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 154–55, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). A direct appeal lies should the parties choose that route. 28 U.S.C. § 1252.

This court like other courts has a duty to "faithfully and impartially discharge and perform all the duties incumbent upon [a] United States District Judge . . . agreeable to the Constitution and laws of the United States . . . ." The Constitution is the "supreme law of the land." Only by forthright recognition of rights reserved to the people by the Constitution and laws can those rights be made real to the people whom government officials are chosen to serve.

I therefore hold and declare that the provisions of 42 U.S.C. § 2210(e) and any other provisions necessary to implement the $560,000,000 limitation of liability are unconstitutional and unenforceable insofar as they apply to nuclear incidents occurring inside the United States.

Counsel may tender any further order or judgment appropriate under the foregoing memorandum of decision.