**1354**

MINNESOTA FEDERATION OF TEACHERS, on behalf of their organization and members and Richard M. Mans, President, Minnesota Federation of Teachers, Taxpayer, Appellants,

v.

Dr. Ruth RANDALL, Commissioner of the Minnesota Department of Education, Ruth Myers, President of the State Board of Education, Bethel College, North Central Bible College, Northwestern College, Concordia College, Moorhead, Augsburg College, College of St. Thomas, St. John University, College of St. Catherine, Hamline University, Macalaster College, Appellees.

No. 88–5127.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1988.

Decided Dec. 13, 1989.

Ronald G. Marks, Minneapolis, Minn., for appellants.

Cindy L. Lavorato, Asst. Atty. Gen., St. Paul, Minn., for appellees.

Before HEANEY * and BEAM, Circuit Judges, and STUART,** District Judge.

PER CURIAM.

Plaintiffs brought an action in the district court for Minnesota challenging the constitutionality of the Minnesota Post–Secondary Enrollment Options Act. Minn. Stat. § 123.3514 (1986) (Act). The Act allows public high school students in their junior and senior years to take advanced courses at two- and four-year colleges, some of which are religiously affiliated. Minnesota reallocates funds from public schools to these colleges in proportion to the amount of course work done by public students at these colleges.

The plaintiffs are the Minnesota Federation of Teachers (M.F.T.) and Richard Mans, the President of M.F.T. Their complaint alleges that the Act violates the establishment clause of the first amendment, and that it violates Minnesota's Constitution. They request declaratory relief, as well as the enjoining of disbursements to religiously affiliated schools. The district court granted summary judgment for the defendants, holding that all the plaintiffs lacked standing. We reverse in part and affirm in part.

## I.  BACKGROUND

The Act permits any eleventh or twelfth grade public high school student to enroll for high school credit in nonsectarian courses offered at the post-secondary institution of his or her choice. The student is not required to pay for the course if the student is accepted by the institution, the course would count as credit toward graduation at that post-secondary school, and the course is taken only for high school credit. If these requirements are met, the state reimburses the institution in an amount equal to the lesser of: (1) the actual cost of tuition, textbooks, materials and fees at the college attended, or (2) the per-student funding normally provided to the student's public high school, prorated by course units. Following completion of the course, the books and materials become the property of the student's public school district.

During 1985–86, 3,523 students statewide participated in the program, of which 230, or 6.52%, attended private colleges. In the following year, 2,182 students participated, of which 138, or 6.32%, attended private colleges. During the 1985–86 school year, between 12,000 and 13,000 courses were taken at post-secondary schools under the program. Affidavit of Jessie Modano, State Project Director, at 3 (July 29, 1987); Joint App. at 182–83. Reallocation may amount to approximately $200 per pupil unit. Deposition of Richard Mans at 20 (February 25, 1987); Joint App. at 121.[1]

---

* The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988.

** The HONORABLE WILLIAM C. STUART, United States Senior District Judge for the Southern District of Iowa, sitting by designation.

1.  Unfortunately, neither party developed the relevant statistics. On the basis of these figures, it appears that there was a reallocation of funds statewide of $2,400,000.00 ($200 × 12,000 courses) in 1985–86. Assuming roughly 6.5% of the course work was done at private colleges, the reallocation to private schools, sectarian and nonsectarian, was about $156,000 statewide that year. We are hesitant to rely on these figures, however, because the $200 estimation appears speculative. Moreover, we do not know if "per pupil unit" and per course are the same measure. If they are not, then the true figures are higher.

## II. DISCUSSION

### A. RICHARD MANS

Richard Mans is the President of M.F.T. and a media teacher. He asserts several injuries. First, as a taxpayer, he protests the disbursement of tax money to sectarian schools. Second, he argues that the reallocation of funds reduces money available for his salary. Third, Mans relates that when one student left his class under this program the budget for his course was reduced, adversely affecting his remaining students and his teaching experience.

The jurisdiction of federal courts is limited to "cases and controversies." U.S. Const. art. III. One aspect of this limit is the determination of whether the plaintiff is the proper party to litigate the dispute. To have standing to sue, the Constitution requires that each plaintiff show both an injury in fact and that she deserves the protection of the statutory or constitutional provisions invoked. *Ass'n of Data Processing Service Org. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *cf.* Fletcher, *The Structure of Standing*, 98 Yale L.J. 221 (1988). In addition, prudential concerns sometimes militate against granting standing to those seeking to assert either the rights of others or generalized social grievances, and those unable to litigate the merits with sufficient vigor to properly present the issues. *Warth v. Seldin*, 422 U.S. 490, 498–501, 95 S.Ct. 2197, 2204–06, 45 L.Ed.2d 343 (1975). Special rules have developed regarding types of plaintiffs and their claims. We address initially Mans' claim to have state taxpayer standing.

In this case, the district court concluded that to have standing Mans must show an increase in his overall tax burden from the challenged action, relying on *Doremus v.*

*Bd. of Educ.*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) (state taxpayers denied standing). Since Mans could not prove that his taxes had been raised, the district court felt that he lacked standing to challenge the Act. We believe that the district court has misconstrued *Doremus*, and underappreciated the import of other Supreme Court decisions.

Initially, municipal taxpayers were thought to have suffered sufficient injury from improper local expenditures to have standing to challenge the expenditures, while federal taxpayers' injury was considered too minute and indeterminable in relation to federal expenditures to sustain standing. *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Standing rules for state taxpayers were not formalized until *Doremus*. *Frothingham* was subsequently re-evaluated in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *Flast* and its progeny establish that a federal taxpayer may sue to prevent the disbursement of tax money where the disbursement violates the establishment clause of the first amendment and where the disbursement is made pursuant to Congress' power to tax and spend. *Flast*, 392 U.S. at 102, 88 S.Ct. at 1953.[2] The district court recognized that under *Flast* only a disbursement of public funds was required, but felt that the injury analysis for state taxpayers was still analytically distinct. We begin by clarifying *Doremus*.

In *Doremus*, state taxpayers challenged a law authorizing public school teachers to read aloud from the Bible. The Supreme Court held that they lacked standing because they could not show how mandatory Bible-reading was "supported by any separate tax *or* paid for from any particular appropriation *or* that it adds any sum what-

---

**2.** *Flast* required a nexus between the plaintiffs' status and the power invoked by Congress, and a further connection between the power invoked by Congress and a specific constitutional limit on that power. *Flast*, 392 U.S. at 102–03, 88 S.Ct. at 1953–54. *Flast* found such a relationship between a taxpayer and the tax and spend power, and the tax and spend power and the prohibition against government financial aid to religious organizations embodied in the estab-

lishment clause. Subsequent cases leave the precise scope of *Flast* uncertain. *See, e.g., Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (standing to challenge executive decisions); *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (no standing to challenge disbursement made pursuant to property administration powers).

ever to the cost of conducting school." *Doremus*, 342 U.S. at 433, 72 S.Ct. at 397 (emphasis added). The district court incorrectly interpreted this language to require that Mans show an increase in his tax bill. *Doremus*, however, clearly indicated that an increase in the plaintiff's tax burden was only one way injury could be shown. As the language above indicates, the Court believed that direct expenditures would also suffice. The plaintiffs in *Doremus* were denied standing because they failed to connect any state expenditures to the challenged action. *Id.* at 434, 72 S.Ct. at 397. Moreover, the Court in *Doremus* was careful to distinguish *Everson v. Bd. of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In *Everson*, a state taxpayer challenged public expenditures for the transportation of parochial school children. The *Doremus* Court described the dispute in *Everson* as justiciable because "Everson showed a measurable appropriation or disbursement of school-district funds occasioned by the activities complained of. This complaint does not." *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397. *Everson* also indicated that the establishment clause limits state spending powers as well. *Everson*, 330 U.S. at 16, 67 S.Ct. at 511. Thus, the effect of *Flast* was to harmonize in some respects federal and state taxpayer standing. *Flast*, 392 U.S. at 102, 88 S.Ct. at 1953.

Other Supreme Court decisions support the view that *Doremus* only requires a measurable expenditure of tax money, and indicate that *Flast* and *Doremus* are now relied on interchangeably where establishment clause violations are urged. On the same day *Doremus* was decided, the Court handed down *Adler v. Bd. of Educ.*, 342

U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952). In *Adler*, a state law required the dismissal of any public school teacher who belonged to a subversive organization. Justice Frankfurter dissented, arguing that the Court lacked jurisdiction because the plaintiffs lacked standing. With respect to the taxpayer-plaintiffs, Frankfurter argued that under *Doremus* they did not have standing because the taxpayers could not show that their tax burden would be increased. *Adler*, 342 U.S. at 501–02, 72 S.Ct. at 389 (Frankfurter, J., dissenting). The other eight justices ignored Justice Frankfurter's arguments and reached the merits. In *Chambers v. Marsh*, 675 F.2d 228 (8th Cir.1982), we relied on *Flast* in holding that Chambers had standing as a state taxpayer. The Supreme Court affirmed on standing, writing: "[W]e agree that Chambers, as a member of the legislature and as a taxpayer whose taxes are used to fund the chaplaincy, has standing to assert this claim." *Marsh v. Chambers*, 463 U.S. 783, 786 n. 4, 103 S.Ct. 3330, 3333 n. 4, 77 L.Ed.2d 1019 (1983). No showing of an increased tax burden was ever made, nor did our reliance on *Flast* meet with disapproval.[3]

The only case relied on by the district court for its view of *Doremus*, is *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir.1984). *Hoohuli*, however, does not hold that an increase in the plaintiff's tax burden is required. In fact, that court noted that the injury analysis required under *Flast* and *Doremus* was the same. *Id.* at 1179. *Hoohuli* found standing because the plaintiffs attacked specific disbursements and requested the money be returned to the state treasury. *Id.* at 1172, 1180.[4]

---

**3.** More recently, we have again required only a measurable disbursement of state funds. *Pulido v. Bennett*, 848 F.2d 880, 886, *modified*, 860 F.2d 296 (8th Cir.1988). In *Pulido*, we referred to *Doremus* and *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). *Grand Rapids* considered the merits of a state taxpayer suit against a program aiding private schools. The Court noted in a footnote that the lower courts had properly decided the taxpayers had standing. *Grand Rapids*, 473 U.S. at 380 n. 5, 105 S.Ct. at 3220 n. 5. The cases cited in that footnote where state taxpayer standing was found, in turn analyze standing

under *Flast*, as had the district court in that case. *Americans United for Separation of Church and State v. Grand Rapids School District*, 546 F.Supp. 1071, 1075 (W.D.Mich.1982).

**4.** In addition, the *Hoohuli* court indicated that it was guided in its analysis by *Public Citizen, Inc. v. Simon*, 539 F.2d 211 (D.C.Cir.1976) (federal taxpayers), which viewed the injury required as only a conceptual necessity. "The impact on federal taxpayers in such cases is conceptually direct, even though the dollar-and-cents consequence for a taxpayer is minimal." *Id.* at 218. The *Hoohuli* court thought only that there might

Our interpretation of *Doremus* is buttressed by the fear that the district court's decision could lead to the abolition of taxpayer standing altogether. Where a free exercise of religion injury is alleged, plaintiffs can argue that an activity they distinctly wish to engage in has been restricted. But only a taxpayer really suffers a distinct injury from the improper use of public money in violation of the establishment clause. The district court's view would allow standing only where a special tax assessment was levied to pay for the expenditure. Thus, when expenditures are made from general funds, no one would be able to challenge establishment clause violations. We believe that taxpayer standing was created to specifically permit the airing of establishment claims, and we decline to effectively abolish it.[5]

■■■ Accordingly, we do not believe that state taxpayers are required to show an increase in their tax burdens to allege sufficient injury. Under applicable law, state taxpayers must only show that there has been a disbursement of tax money in potential violation of constitutional guarantees. Richard Mans has met this burden and has standing to challenge the Act.[6]

## B. MINNESOTA FEDERATION OF TEACHERS

M.F.T. asserts two forms of standing. First, M.F.T. claims standing as a representative of its 17,000 dues-paying members who are primarily elementary and secondary public school teachers. Second, M.F.T. asserts standing on its own behalf because the reallocation of funds reduces the amount of funds available to school districts. The Act could thus reduce the number of teachers paying dues because teachers can be terminated for "[d]iscontinuance of position or lack of pupils." Minn. Stat. § 125.17 Subd. 4(5) (1979). In addition, M.F.T. argues that reallocation reduces the pool of money available for teacher salaries, damaging M.F.T.'s position in contract negotiations. Deposition of Edward Bolstad at 33 (February 25, 1987); Joint App. at 168.

■■■ "[I]n the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. The Supreme Court has listed three prerequisites to representational standing. First, the members of the organization must otherwise have standing to sue in their own right. Second, the interests which the organization seeks to protect must be germane to its purpose. Third, neither the claim asserted, nor the relief requested, can require participation of the organization's individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). This court has previously noted that each of

---

be a difference between state and federal taxpayer standing in deciding whether executive or administrative decisions were constrained. *Hoohuli*, 741 F.2d at 1180 (relying on *Public Citizen*). The Supreme Court has since indicated that there is no such distinction. *Kendrick*, 108 S.Ct. at 2562; *see also Pulido*, 860 F.2d at 297.

**5.** We are thus even less disposed to favor the state's further request. The state urges us to add to the district court's test the necessity of showing that the complained of injury would be redressed by a favorable decision. Thus, according to the state, a taxpayer could only have standing if she could show an increased tax burden, and prove that her taxes would be lowered if she prevails. The State relies on *Valley Forge*, 454 U.S. at 464, 102 S.Ct. at 752, which denied the plaintiff standing to challenge the transfer of government property to a religious organization pursuant to the government's property powers. While *Valley Forge* discussed the concept of redressability in its introduction, *Id.* at 472, 102 S.Ct. at 758, *Valley Forge* did not make redressability an element of taxpayer standing. We decline to do so in light of the foregoing discussion. *See also, Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982) (only constitutionally required inquiry is whether there is an "injury in fact."); *Warth*, 422 U.S. at 514, 95 S.Ct. at 2213.

**6.** Mans' other asserted individual injury is decreased job satisfaction. The law recognizes noneconomic injuries, but requires a direct and specific injury to such interests. *United States v. SCRAP*, 412 U.S. 669, 686–87, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Data Processing*, 397 U.S. at 154, 90 S.Ct. at 830. In light of our holding that Mans has taxpayer standing, we need not decide whether his other assertions would also support individual standing.

these three requirements must be met in order to establish representational standing. *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684, 690 (8th Cir.1979).

Here, there is no doubt that many of the members of M.F.T. are possibly injured as taxpayers. Furthermore, individual participation to adjudicate the establishment claim is unnecessary. The only issue requiring closer analysis is whether the interests which M.F.T. seeks to protect in this dispute are germane to M.F.T.'s purposes.

■ In this case, the interest ultimately at stake are M.F.T.'s members' interests in the use of their tax money to support sectarian schools. Although it is discernable from the complaint and other parts of the record that M.F.T. seeks to assert representational standing and that its members are allegedly injured as taxpayers,[7] nothing in the complaint or record demonstrates how these taxpayer interests are germane to the organization's specifically stated purposes. *See Associated General Contractors*, 611 F.2d at 691. Furthermore, M.F.T.'s charter fails to mention any interest in taxes. *Cf. International Union, UAW v. Brock*, 477 U.S. 274, 286, 106 S.Ct. 2523, 2530, 91 L.Ed.2d 228 (1986) (holding that there was little question that the

UAW's interests which it sought to protect were germane to the organization's purposes because the constitution of the UAW announced goals which clearly established those interests).

M.F.T. is not an organization of taxpayers. The fact that some or all of its members pay taxes is purely incidental. We, therefore, conclude that an insufficient nexus exists between the purposes and activities of M.F.T., a teachers' union, and the tax money concerns expressed in the complaint and record to satisfy the second portion of the *Hunt* test of representational standing.

■ M.F.T. also asserts organizational standing in its own right, claiming as its injury the potential threat of lost membership and dues. The district court concluded that M.F.T. failed to allege any injury directly caused by the Act. We agree that the fear of possible injury and M.F.T.'s philosophical concerns are insufficient to satisfy the requirement of the standing doctrine that plaintiffs demonstrate a judicially cognizable injury. *See Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758.

■ M.F.T. has not satisfied the requirements for either representational standing [8] or organizational standing.[9] Accordingly,

---

**7.** The complaint recites in part:
　4. Plaintiff Minnesota Federation of Teachers is a labor organization affiliated with the American Federation of Teachers, AFL–CIO, and serves approximately 17,000 dues paying members who primarily are elementary and secondary public school teachers throughout the State of Minnesota.
　5. Plaintiff Richard M. Mans is a taxpayer and the President of the Minnesota Federation of Teachers.
Joint App. at 7. *See also* Affidavit of Richard Mans (April 20, 1987), Joint App. at 179 (taxpayer status); Deposition of Richard Mans at 7–8 (February 25, 1987), Joint App. at 108–09 (M.F.T.'s interest is in the diversion of money from public education).

**8.** The dissent cites *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) for the proposition that an allegation by M.F.T. that its members are taxpayers is, by itself, sufficient to confer representational standing. We disagree. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441, decided subsequent to *Meek*, requires the three part representational analysis, discussed on page 1358, *supra*, even when it is alleged that member

taxpayers seek to enjoin, as here, the expenditure of tax funds. Thus, M.F.T. fails the relevant test because of a lack of nexus between the tax expenditures and the stated purposes of the teachers union.

**9.** The dissent, in its footnote 5, *infra*, takes judicial notice of several documents not made a part of the record in the district court. We disagree with the propriety of this approach. Even though the Eighth Circuit, in *Gustafson v. Cornelius Co.*, 724 F.2d 75, 79 (8th Cir.1983), has authorized judicial notice of a fact for the first time on appeal, we believe that the better reasoned rule is the one followed by the Seventh Circuit in *Zell v. Jacoby–Bender, Inc.*, 542 F.2d 34, 37–38 (7th Cir.1976) (circuit will consider on appeal only the record before the trial court). It is unfair to reverse the district court upon evidence which it had no opportunity to consider. Here, it is also unfair to the parties, especially the appellees, to have an appeal considered on factual matters not offered or received as part of the Fed.R.Civ.P. 56 proceeding.
　An appellate court contemplating original judicial notice should, however, notify the par-

we affirm the district court's dismissal of M.F.T.'s claims for lack of standing.

## III. CONCLUSION

Based on the foregoing reasons, we hold that M.F.T. lacks both representational and organizational standing, and thus we affirm that portion of the district court's opinion. We also hold that Richard Mans has taxpayer standing to challenge the Act because the complaint sufficiently alleges that the Act may expend public funds in violation of the establishment clause. We reverse the portion of the district court's judgment which denies standing to Richard Mans and remand the case for proceedings consistent with our opinion.

HEANEY, Senior Circuit Judge, concurring in part and dissenting in part.

I express no view as to the merits of this litigation. I strongly believe, however, that under Supreme Court precedent all the plaintiffs have standing to seek adjudication of their claims.

Initially, I agree that Richard Mans has standing as a state taxpayer to challenge the Act. Accordingly, I concur fully in part II–A of the per curiam opinion. The majority clearly errs, however, in holding that the Minnesota Federation of Teachers (M.F.T.) lacks representational standing where its members are injured only as taxpayers. In *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court held that the American Civil Liberties Union, the National Association for the Advancement of Colored People, the Pennsylvania Jewish Community Relations Council, and Americans United for Separation of Church and State each had standing to bring an establishment clause challenge to a school aid program because their members were injured as tax-

payers. We therefore have no alternative but to reverse the district court's denial of standing to M.F.T. Alternatively, I also disagree with the majority's conclusion that M.F.T. lacks standing in its own right or as a representative of its members who are injured as teachers.

### I.

M.F.T. has standing to represent its members injured as taxpayers. An organization has standing as the representative of its members when three conditions are satisfied.

Thus we have recognized that an association has standing to bring suit, on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members of the lawsuit.

*Hunt v. Washington Apple Advertisers Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The majority agrees that the first and third parts of the *Hunt* test are satisfied. M.F.T.'s members are injured as taxpayers and individual participation is unnecessary. They hold, however, that M.F.T. cannot pursue this case as a representative of its members who are injured as taxpayers because such an injury is not "germane" to M.F.T.'s purposes. "M.F.T. is not an organization of taxpayers. The fact that some or all of its members pay taxes is purely incidental." *Ante* at 1359. I respectfully disagree with the majority's analysis.

The majority errs by comparing M.F.T.'s organizational purposes to the type of individual injury suffered. Usually the injury suffered for the purposes of standing and the plaintiff's interest in the merits are

---

ties so that the propriety of taking notice and the tenor of the matter to be noticed can be argued.... If oral argument has already been completed, the court should at least afford the parties an opportunity to submit supplemental briefs.

Weinstein & Berger, 1 Weinstein's Evidence ¶ 201[06], at 201–49 (1989). *See also Massachu-*

*setts v. Westcott,* 431 U.S. 322, 323 n. 2, 97 S.Ct. 1755, 1756 n. 2, 52 L.Ed.2d 349 (1977). Further, the documentary material considered by the dissent is not the type of evidence embraced by Fed.R.Evid. 201(b)(2). And, some of the papers referred to in the dissent would very likely be considered inadmissible hearsay if offered by a party.

identical. In taxpayer cases, however, the plaintiff's interest always lies in the appropriateness of the public spending, rather than in concerns over the fraction of a penny of her tax bill attributable to the challenged expenditure. We recognize in that fraction of a penny an injury sufficient to support standing. It is not necessary to find a second injury to support representational standing. *When screening representatives, we are only concerned with whether they are acting as an extension of their members and whether they are able to litigate the merits with concrete adverseness.*[1] *Hunt*, 432 U.S. at 345, 97 S.Ct. at 2442. The germaneness test asks merely whether the organization has a documented interest in the merits of the dispute and whether it has subject-matter expertise with respect to the merits. To answer these questions, we must compare the organization's purpose to the substance of the litigation rather than to the injury allegedly suffered by its individual members.

The Supreme Court has granted standing to groups that were not taxpayer groups to represent their members injured as taxpayers where the groups' concerns related to the substance of how public tax money was being spent. In *Meek v. Pittenger*, four associations joined with individual plaintiffs to contest state aid to sectarian schools. The associations were the ACLU, the NAACP, the Pennsylvania Jewish Community Relations Council, and Americans United for Separation of Church and State. The first three groups are not primarily committed to taxpayer issues,[2] but the Supreme Court found that each had standing because they represented members who were injured as taxpayers. *Meek v. Pittenger*, 421 U.S. at 355, n. 5, 95 S.Ct. at 1758 n. 5 (adopting the analysis of the three-judge

district court found at 374 F.Supp. 639, 647 (E.D.Pa.1974)). Each organization had an organizational interest and expertise that related to the substance of the litigation, state spending on public education and the separation of church and state, rather than to state tax policy generally.

The Court distilled the *Hunt* test from past cases . including *Meek v. Pittenger*. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. The first part of the *Hunt* test requires an individual injury and satisfies the constitutional floor of standing law, injury in fact. The third part screens out those cases where, because of the claims brought or relief requested, individual participation is necessary. Both of these tests evidence our general concern that the plaintiff be the appropriate party to bring the suit. The germaneness test also evidences this concern. After reviewing *Meek, Hunt* and *International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (*UAW*), I agree with the District of Columbia Circuit, and a member of our court, that the sole purpose of the germaneness test .is merely to prevent organizations from pursuing litigation concerning subjects about which they have little expertise or concerning grounds other than those which have brought their membership together. *Humane Soc. v. Hodel*, 840 F.2d 45, 56 (D.C.Cir.1988) (Wald, C.J., Bork, and Gibson, F., sitting by designation).[3] The germaneness requirement serves no other purpose, and the majority posits none. Accordingly, to insure that M.F.T. is furthering its members' interests and is able to litigate the merits with sufficient adverseness, we must . ask what relationship exists between the merits of this suit and M.F.T.'s purposes.

---

**1.** This is especially important in cases in which all the plaintiffs are acting as representatives. Where an individual plaintiff is also a party to the suit and has standing, our jurisdiction to review the acts of other branches of government is in any event triggered, and our concerns with respect to the addition of a representative of similar plaintiffs are clearly prudential in nature.

**2.** *See Meek v. Pittinger*, 374 F.Supp. 639 (E.D.Pa. 1974): Plaintiffs' Complaint at 2; Motion of

Intervenor, Jose Diaz, et al. at 2; Intervenor Brief at 36.

**3.** This test adequately screens out unsuitable representatives. As the District of Columbia Circuit noted, this construction of the germaneness test would not support a grant of standing to an auto workers' union to press an establishment clause challenge to a school aid program. *Humane Soc. v. Hodel*, 840 F.2d at 57.

The substance of this lawsuit regards public spending on public education. M.F.T. is committed to "securing conditions essential to the best professional services." M.F.T. Constitution at 2, Affidavit of Edward Bolstad, Exhibit A (Aug. 21, 1986). Litigation to restore state tax money diverted from public education to sectarian schools certainly manifests this interest. "[O]ur opposition to the diversion of funds from public education to any form of private is longstanding and not only particular to this lawsuit." Bolstad Deposition at 10. This litigation was approved by a unanimous vote of M.F.T.'s Board. *Id.* at 12. Clearly, this litigation is germane to the purposes which have brought M.F.T.'s members together.

M.F.T.'s organizational expertise is also pertinent to this litigation. M.F.T. has expertise with respect to the nature of education and the administration of school budgets. One of the issues in this case may well be how the money received by the sectarian schools is used to sustain the operation of the schools. While in this case Mans may be able to draw upon M.F.T.'s resources, we have a duty in developing the law to carefully consider the right of M.F.T.'s members to be represented by M.F.T. M.F.T. is not attempting to assert the rights of a third party. Representational standing involves the right of individuals whose posture satisfies the constitutional prerequisites of standing to assert their claims through the associations they have formed. *UAW,* 477 U.S. at 290, 106 S.Ct. at 2533. When recently asked to abandon the representational standing formalized in *Hunt,* the Supreme Court declined because association resources and expertise can be invaluable in sharpening the presentation of the issues and in improving judicial decisionmaking. *UAW,* 477 U.S. at 289, 106 S.Ct. at 2532.

Finally, the suggestion of the majority, *ante* n. 8, that somehow *Hunt* has diminished the significance of *Meek* is unpersuasive. Not only did *Hunt* rely on *Meek* for the construction of its three-part test, which *Hunt* represented as previously announced, but subsequent decisions reject the narrow view of germaneness taken by the majority. One year after *Hunt* was decided, the Supreme Court granted standing to the Catawba Central Labor Union to challenge the constitutionality of a federal law regarding nuclear power where some members of the union might be injured by the proximity of their residences to a proposed nuclear power plant. *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 67, 73–74, 81, 98 S.Ct. 2620, 2630, 2634, 57 L.Ed.2d 595 (1978); *see Carolina Envtl. Study Group v. United States,* 431 F.Supp. 203, 205, 218–21 (W.D.N.C.1977) (description of plaintiffs and injuries). There was no allegation that the interest of the union in collective bargaining was adversely affected.

Although the germaneness requirement was not explained nor even an issue in *Hunt,* the majority seems to believe that the *very wording* of the germaneness test creates an inconsistency with the results reached in *Meek* and *Duke Power.* The majority acts on its textual suppositions in preference to the actual results of these decided cases, arguing only that *Hunt* was "decided subsequent to *Meek.*" *Ante* n. 8. I interpret this to mean that the majority finds some tension between *Hunt* and *Meek* and chooses to favor its interpretation of *Hunt* because *Hunt* was decided later.

With all due respect, no conflict between past cases is apparent to me, nor should we construe these cases to create one. If a conflict does lurk here, the majority should explain from where it originates. The majority does not explain how *Hunt,* in which germaneness was not discussed and was not an issue, creates a conflict with the results in *Meek* and *Duke Power.* Nor does the majority explain why the interpretation given germaneness by the District of Columbia Circuit is inconsistent with existing precedent. The majority also does not explain why, out of prudence or for constitutional reasons, their construction of *Hunt* is required. They do not indicate what specific purpose they believe the germaneness requirement serves within the structure of standing doctrine. Nor do they cite any cases from any court which

similarly interpret the law. The only conflict apparent to me is between today's decision and the relevant case law.[4]

## II.

The majority also errs by taking too narrow a view of M.F.T.'s purposes. The majority seems to regard M.F.T.'s purposes as limited because it is merely "a teacher's union." *Ante* at 1359.

Perhaps underlying the majority's reasoning is the sense that M.F.T. is an economic association primarily concerned with the elements of collective bargaining. The record establishes, however, that M.F.T. has other concerns. The Preamble to the M.F.T. Constitution expresses a commitment to the vitality of the public schools. M.F.T. Constitution at 1. The stated objectives include: "To raise the standards of the teaching profession by securing conditions essential to the best professional service." *Id.* at 2. The M.F.T. Constitution also recites that M.F.T. is the state chapter of the American Federation of Teachers (A.F.T.), and incorporates by reference part of the A.F.T. Constitution.[5] All members of M.F.T. belong to A.F.T. The A.F.T. Constitution includes as objectives "the maintenance of modern, well-equipped schools" and "the passage and retention of just laws that will improve the educational climate for students, teachers and other workers in education...." A.F.T. Constitution at 2 (1988). In addition, A.F.T. engages in extensive national lobbying, including lobbying on tax issues such as tuition tax credits, tax preferences regarding annuity programs, and taxation of employee benefits. *Introducing the American Federation of Teachers* at 6. A.F.T. also arranges travel discounts, life and medical insurance, personal liability insurance, prescription discounts, magazine subscription discounts, and sponsors a VISA card with low interest rates. *Id.* at 20–23. Clearly A.F.T. provides its members with a full range of financial services, including lobbying for a federal tax deduction for state and local taxes. *Id.* at 6.

The M.F.T. Constitution expresses a particular vision of the role of teachers and schools in society, suggesting that its members are not only teachers, but teachers bound by shared ideals.[6] The fact that M.F.T. is a labor union does not mean that it is exclusively concerned with the terms of collective bargaining. In fact, such a restriction ignores the history of the labor movement in this country and the diversity of relationships between unions and their members. Unions often operate as political and social actors, lobbying legislatures or sponsoring charity projects, and frequently

---

**4.** *Meek, Hunt* and *Duke Power* were all decided in a three-year period. *If* there is any conflict at all among these three Supreme Court cases it would lie between the stated test of *Hunt* and the result in *Duke Power*, where the facts specifically regarding the union's standing were unstated. Thus, if we were to focus merely on which case was "subsequently decided," the majority's conclusion would be erroneous. In my view, until the Supreme Court expresses its own disapproval of any of these decisions, we should construe them as consistent.

**5.** The parties focused below on the relation between M.F.T., its members, and the substance of this litigation. Were we to remand this matter for application of a functional version of the majority germaneness test, see *infra* pages 1364–65, further information would be submitted. I take judicial note of the A.F.T. Constitution and other official publications of that organization.

**6.** The Preamble to the M.F.T. Constitution states:

We believe in democracy, as implied in the Constitution of the United States and in the Declaration of Independence, and in the schools as the chief agency of democracy. We believe that the schools, in many instances, have failed of their fullest accomplishment because of a too seclusive attitude, too close adherence to tradition, and a failure to serve as a virile social force in the life of the community.

We believe that the teachers, properly organized, working in an atmosphere of freedom and self-respect, are in the best position to effect the necessary changes in the schools to overcome these conditions; to restore true democracy to education and to train free and unafraid American citizens.

We believe that the teacher is one of the most highly productive of workers and that the best interests of the schools and of the people demand an intimate contact and an effective cooperation between the teachers and the workers of the community—upon whom the future of democracy must depend.

serve their members as multi-service financial associations. In *UAW*, the Supreme Court rejected a more narrow view of union interests and purposes.[7]

The majority does not indicate whether we are required to attach legal significance only to M.F.T.'s collective bargaining status. I would not. Nor, in discerning its purposes, would I confine my inquiry to the face of an organization's charter.[8]

What is germane to an organization's purposes should be judged by what an organization actually does for its members, rather than determined on the basis of any "magic words" in its charter. To focus only on stated purposes would both limit and expand standing in comparison to a functional approach, because an organization presumably would merely have to amend its charter to satisfy a formal test. Moreover, *Hunt* supports the view that we should consider the function of the organization in addition to its stated purposes in determining what its interests are. In *Hunt* the State of Washington established a state commission to promote the sale of Washington apples through advertising and research. The commission was elected by growers and paid for by statutory assessments levied by the state. Subsequently, the State of North Carolina adopted a regulation that prejudiced Washington apple growers. The commission brought suit alleging injury to Washington growers. The State of North Carolina argued that the commission lacked standing because it was not engaged in the growing or selling of apples and had suffered no injury, nor could it assert representational standing because it had no members. The Supreme Court disagreed, reasoning that the commission functioned and operated as if it were a voluntary association of growers. 432 U.S. at 344–45, 97 S.Ct. at 2441–42. Restricting our examination to only M.F.T.'s stated purposes would be inconsistant with *Hunt*. The statute creating the commission in *Hunt* never mentioned bringing suits to adjudicate interstate trade disagreements. The Court considered, instead, the commission's functional role, explicitly refusing to "exalt form over substance." *Id.* at 345, 97 S.Ct. at 2442; *accord Humane Soc. v. Hodel*, 840 F.2d at 59.

Accordingly, were a court to consider the relation between M.F.T.'s purposes and advocacy on behalf of their members as state taxpayers, a sufficient nexus could exist. M.F.T. and its parent union offer M.F.T.'s members a broad range of financial services and represent their economic interests. Moreover, a taxpayer's injury is, by the most formal of reasoning, conceptually economic in nature. The record establishes that M.F.T. is an economic association. To require also a stated interest in taxes would similarly handicap any business as-

---

**7.** The government unpersuasively argued to the court:

> A union, after all, is organized to facilitate joint employee activity in labor matters and to serve as the exclusive collective bargaining representative of workers in the bargaining unit; it is not an ombudsman for the economic interests of its members in government benefit programs. Nor is the Union's asserted 'long-term dedication' (Pet.Br. 9) and 'demonstrated commitment' (*id.* at 15) to its members' economic security a sufficient ground to establish representative standing.

Brief for the Respondent at 26–27. In an accompanying footnote, the government remarked:

> This case, of course, does not involve a union's traditional responsibilities in the areas of joint employee labor activities or collective bargaining contracts.

*Id.* at 26 n. 24.

**8.** It is not clear whether the majority would require an interest in taxes be particularly disclosed in the charter. *Compare* Majority Op. at 1359 ("stated purpose") with *id.* at 1359 ("purposes and activities"). Nor does our decision in *Associated Gen. Contractors v. Otter Tail Power*, 611 F.2d 684 (8th Cir.1979) (per Heaney, J.), decide the issue. There the dispute was whether the injuries could be traced to any organizational purpose and whether there was a conflict between the interests of the association members. There was no dispute over which materials to examine to define organizational purposes. For commentary on the issue of member conflict, see *National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, 1232–33 (D.C.Cir.1987). Unlike the business association in *Associated Gen. Contractors*, unions are regulated with respect to their internal decisionmaking. *See* 29 U.S.C. § 401 *et seq.* (Landrum–Griffin Act).

sociation that failed to mention taxes in its charter.

## III.

M.F.T. also has standing to represent its members who are injured as teachers. Under *Hunt,* M.F.T. must initially show that its members would have standing individually. An individual must suffer "injury in fact" to invoke the jurisdiction of a federal court. The injury must be traceable to the Act and potentially redressable by a favorable decision. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). At this stage of the case, the district court and this court may ask only whether the allegations of the complaint, if true, state a claim, and whether the plaintiffs can put on sufficient evidence which, if believed, would support their allegations.[9]

The plaintiffs argued that the Act causes a deterioration in working conditions and threatens teacher terminations as well as reductions in compensation. In rejecting Mans' claim that he has standing as a teacher and M.F.T.'s claim that its members are injured as teachers, the district court did not deny that teachers have been or can be injured by the Act. Instead, the district court concluded that the available relief would not redress these injuries because students might simply shift to other post-secondary schools.[10] The district court erred in its analysis.

## A.

Initially, the district court correctly confined its redressability analysis to the subsequent operation of the Act. Redressability regards the relationship of the remedy to the injury. If the alleged injury is fairly traceable to the challenged act, it is only necessary to inquire into redressability to the extent that the relief available differs substantially from the violation of law alleged. *Allen v. Wright,* 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19.[11] In cases where the relief requested is merely the cessation of illegal conduct, redressability will simply be another aspect of the causation analysis. *Id.* In this case, the relief available was the partial invalidation of the Act. The injuries allegedly suffered by teachers flow not merely from the provision of resources to sectarian schools, the alleged illegality, but also from the corresponding reduction in funding. Thus, redressability analysis was required. At the same time, we are concerned only with whether the particular conduct challenged causes an injury and the effect of its cessation. Thus, the district court properly considered only whether partial invalidation of the Act would restore funds to the district, and did not consider what other independent forces might affect district financing and allocations.

Certain principles respecting the application of redressability analysis have

9. The district court granted the defendants' motion for summary judgment based upon the pleadings and supplemental evidence found in affidavits and depositions. On review, "we must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *see Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 114–15, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979) (allegations in complaint "and revealed by initial discovery" regarding standing must be accepted as true subject to proof at trial). When reviewing a summary judgment motion where the record has been supplemented, we ask whether the allegations reveal any genuine issue of material fact and whether the nonmoving party can provide sufficient evidence which, if believed, can establish the elements of its case. *Palmer v. Tracor, Inc.,* 856 F.2d 1131, 1133 (8th Cir.1988). For an

elaboration of summary judgment standards, see *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

10. The plaintiffs sought complete invalidation of the Act. The district court reasoned that only partial invalidation was available because of Minnesota's presumption of severability. Minn. Stat. § 645.20 (1986). This discussion assumes without deciding that this conclusion was correct.

11. Redressability analysis is also unnecessary in some other types of cases. *See* Majority Op., *ante* at 1358, n. 5.; *Roberts v. Wamser,* 883 F.2d 617, 625 n. 3 (8th Cir.1989) (Heaney, J., dissenting).

emerged from recent Supreme Court cases. The remedy sought must be of some direct benefit to the plaintiff, not merely to others who might be similarly situated. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 43–44, 96 S.Ct. 1917, 1926–27, 48 L.Ed.2d 450 (1976). In *Allen v. Wright,* the Court found that it was entirely speculative whether changes in federal tax rules would lead to the desegregation of private schools. 468 U.S. at 758, 104 S.Ct. at 3328. The Court concluded that the injury was not traceable nor redressable because private school administrators and parents who choose to separate children might continue to do so regardless of changes in tax rules.

*Simon* and *Allen* suggest that redressability analysis should be conducted with common sense, with limited speculation as to future events and the conduct of third parties, and with a presumption that actors will act according to normal impulses.[12] The ultimate test is whether "there is a 'substantial likelihood,'" *Duke Power,* 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, or whether it is "more likely than not" that the relief requested will redress the injury. *National Wildlife Federation v. Burford,* 871 F.2d 849, 853 (9th Cir.1989).

The district court believed that the injuries were not redressable because students might simply attend other institutions instead. The district court, however, went too far in speculating upon ways in which the injury would prove not redressable. Under the Act, money is allocated initially for public education and to the respective school districts. Upon the acceptance of a student at a post-secondary institution, money is reallocated to that institution. Thus, the immediate effect of even a partial invalidation of the Act would be the return of money to the public school districts. Subsequent acts would be required to defeat this result.

In deciding that an injunction would not provide Mans or M.F.T. with relief, the district court impermissibly engaged in speculation. The district court assumed that there were other eligible institutions available in each district, that affected students would re-apply to eligible institutions, that there would be room for them at other institutions, and that they would be accepted at other institutions. This is the exact type of forecasting of subsequent administrative, parent and student reaction rejected as insufficient to establish redressability in the plaintiffs' favor in *Allen v. Wright.* The district court's conclusion with respect to redressability was the sole reason given for rejecting Mans' standing as a teacher and M.F.T.'s representational standing of its members as teachers.

### B.

Accordingly, I would reverse the district court's judgment with respect to redressability. If it would prove necessary to the determination of M.F.T.'s standing, I would remand the issue to the district court for its consideration of the remaining requirements for M.F.T.'s organizational standing on behalf of its members injured as teachers. Because I cannot agree with certain statements of law in the majority and the district court opinions, I find it necessary to comment on these issues now.

Mans and M.F.T. put forward specific factual allegations of injury. First, the diversion of funds reduces money available to school districts to pay for salaries and benefits. Affidavit of Richard Mans at 2 (Aug. 25, 1986). Second, resources have been diverted from Mans' school district by student attendance at a religiously affiliated college. *Id.* Third, the diversion of funds reduces resources available for educational programs and materials. *Id.* at 3.

---

12. The law is, however, still unsettled. In *Asarco, Inc. v. Kadish,* 490 U.S. ——, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), the plaintiffs, state taxpayers and the Arizona Education Association, sought to make the State of Arizona comply with federal rules governing the lease and the sale of state lands in the hope of eventually increasing state expenditures for education or reducing state taxes. Had the issue of the plaintiffs' standing been before them, four justices would have held that there was no standing on this ground because the subsequent acts of the state legislature in managing the lands and apportioning public money could not be forecast. 490 U.S. at ——, 109 S.Ct. at 2043, 104 L.Ed.2d at 713.

There is a direct and corresponding reduction for each student lost by the school district and funding for each course is dependent on the number of students involved. Deposition of Richard Mans at 17–20 (Feb. 25, 1987). Fourth, this reduction affects a teacher's ability to practice his profession. Mans Affidavit at 3; Affidavit of David W. Robinson at 2 (Aug. 21, 1986) (teacher). Fifth, the continuation of the Act threatens further losses in the future. *Id.* at 2.

Two forms of injury are alleged: deterioration in working conditions caused by declining resources available for teaching materials and programs; and the likelihood of future reduced teaching positions and compensation available in afflicted school districts.[13] Both are sufficient to support standing.

### 1.

The deterioration of working conditions is a legally cognizable injury. The Supreme Court has long recognized that non-economic and intangible injuries suffice to give a plaintiff standing.[14] The Court has found standing where tangible events, such as changes in land use, could produce reactional injuries among environmentalists. Similarly, the changes brought about by a reduction in school funding are tangible and can produce a dispositional reaction among teachers. The deterioration of their working conditions gives teachers a sufficient personal interest to contest the legality of those changes.

The realistic threat of actual injury is also sufficient to support standing. The majority is wrong when it states without qualification that "the fear of possible injury ... [is] insufficient to satisfy the requirement of standing doctrine that plaintiffs demonstrate a judicially cognizable injury. *See Valley Forge....*" *Ante* at 1359. Past cases conclude quite the opposite.[15]

Mans alleges that the operation of the Act threatens future resource losses to his school district. The Act does not provide any additional funds to the school districts to compensate them for lost resources. The threat of mounting injury in his district and others is entirely plausible and should be subject to proof at trial.

### 2.

Mans and the M.F.T. also claim teachers are injured by the potential effects of the Act on compensation and job security. This type of injury is cognizable and distinctive. It is also sufficiently direct.

An injury sufficient to support standing may be caused through a chain of events having as its origin the challenged action,

13. Neither Mans nor M.F.T. has asserted the interests of school children in reduced resources. *See Brewer v. Hoxie,* 238 F.2d 91, 104 (8th Cir.1956).

14. *Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 230–31 n. 4, 106 S.Ct. 2860, 2865–66 n. 4, 92 L.Ed.2d 166 (1986) (whale watchers' interest in fishing rules); *Gladstone, Realtors, supra* note 9, 441 U.S. at 111–14, 99 S.Ct. at 1613–15 (desire to live in an integrated community); *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973) (SCRAP) (aesthetic injuries caused by reduction in recycling); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972) (aesthetic injury caused by land development); *Association of Data Processing Service Org. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (examples of noneconomic injuries); *see also Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1040 (8th Cir.1988) (aesthetic); *Office of Communication of United Church of Christ v. F.C.C.,* 359 F.2d 994, 1001–01 (D.C.Cir.1966) (listener standing regarding radio station licensing).

15. *Valley Forge College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors, supra* note 9, 441 U.S. at 99, 99 S.Ct. at 1607; *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *SCRAP, supra* note 14, 412 U.S. at 688–89, 93 S.Ct. at 2416; *Data Processing,* 397 U.S. at 152, 90 S.Ct. at 829; *Defenders of Wildlife, supra* note 14, 851 F.2d at 1039; *Carolina Envtl. Study Group. v. United States,* 431 F.Supp. at 209 (objectively reasonable fear and apprehension over subsequent events). Moreover, a realistic threat of actual injury often forms the basis for our jurisdiction over declaratory judgment actions under the Declaratory Judgment Act, 28 U.S.C. § 2201. *See, e.g., United Food & Com. Workers Intern. v. I.B.P., Inc.,* 857 F.2d 422, 426–30 (8th Cir.1988); *Defenders of Wildlife, supra* note 14, 851 F.2d at 1039.

so long as the outcome is reasonably plausible. *C.f. Simon*, 426 U.S. at 44, 96 S.Ct. at 1927 ("Prior decisions of this court establish that unadorned speculation will not suffice to invoke judicial power."); *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (realistic danger).[16] In deciding whether an injury is reasonably traceable to the challenged action, we accept the plaintiff's allegations and apply our common sense. For example, in *Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), an association representing landlords challenged a local ordinance that allowed a hearing officer to consider the hardship of a tenant when reviewing whether to permit a rent increase of more than eight percent in one year. The landlord association failed to allege that any of its members had hardship tenants or had suffered an adverse decision before a hearing officer. The association merely represented in its complaint that its members were subject to the ordinance and indicated during oral argument that it represented most of the residential unit owners in the city who, in turn, did have hardship tenants. Taking reasonable inferences from these statements, the Court concluded that there was sufficient injury. 485 U.S. at 8, 108 S.Ct. at 855, 99 L.Ed.2d at 11 ("it is not 'unadorned speculation ...' ").

At this juncture, the plaintiffs have sufficiently stated an injury with respect to future compensation and employment. The school districts operate with finite resources. The Act reallocates money from each school district at a time when public schools are increasingly asked to perform a variety of social functions, and at a time when new tax revenues are not forthcoming. The Act provides no supplemental appropriations. Edward Bolstad, the Executive Secretary of the M.F.T., reported that one school superintendent had already expressed concerns about staffing cutbacks in his district because of the Act. Bolstad Deposition at 15 (attendance at a community college). He indicated that M.F.T. members were already on unrequested leave because of funding shortfalls in the system. *Id.* at 17. With respect to contract negotiations, Bolstad indicated that funding levels determined M.F.T.'s bargaining position and which types of agreements were possible. *Id.* at 32–34.

These concerns about future compensation and job security are quite plausible. It is reasonable to believe that the Act affects or will affect teacher compensation and job prospects in affected districts. As best we are able to tell, hundreds of thousands of dollars are already reallocated by the Act. Majority Op., *ante* n. 1. At this stage, "Plaintiff need only demonstrate the threats or potential for injury; the injury itself need be nothing more than a trifle.... [Nor must] NWF prove the merits of its case in the course of establishing standing." *National Wildlife Federation v. Burford*, 871 F.2d at 854 (citation omitted).[17]

---

**16.** In *SCRAP*, the Court noted that the "pleadings must be more than an ingenious exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected...." *SCRAP, supra* note 14, 412 U.S. at 688–89, 93 S.Ct. at 2416. The Court found a cognizable injury in *SCRAP* despite the chain of events involved:

Here, the Court was asked to follow a far more attenuated line of causation to the eventual injury of which appellees complained—a general [railroad] rate increase would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from

the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area.

*Id.* at 688, 93 S.Ct. at 2416. The Court, however, has rejected more conjectural theories of causation where the plaintiff relied on the occurrence of significant and speculative independent intervening events and reactions. *Warth, supra* note 9, 422 U.S. at 509, 95 S.Ct. at 2210 (speculative as to whether failure of a community to allow low-income housing might increase taxes in adjoining community).

**17.** *Accord ACLU of Illinois v. City of Saint Charles*, 794 F.2d 265 (7th Cir.), *cert. denied*, 471 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *see also Gladstone, Realtors, supra* note 9, 441 U.S. at 114, 99 S.Ct. at 1615 (sufficiency of allegations); note 15 *supra* (threatened injury can be sufficient).

## IV.

I also believe that the district court erred in concluding that M.F.T. lacked standing in its own right. M.F.T. has standing in its own right because its organizational interests are affected by reduced funding for public schools. M.F.T. has 17,000 dues-paying members, primarily elementary and secondary public school teachers. Complaint, paragraph 4. M.F.T. is concerned that members could lose their jobs because of cutbacks caused by the Act. Bolstad Affidavit at 2 (loss of dues and associational interests). The Act also reduces money available during negotiations for compensation. *Id.* at 3. Hundreds of thousands of dollars are likely to be reallocated by the Act. Majority Op., *ante* n. 1.

The district court rejected this claim because:

> Although M.F.T. claims standing in its own right, it has failed to allege any injury caused by the Act. In fact, Richard Mans admitted during his deposition that M.F.T.'s only injury is a "philosophical question of [M.F.T.'s] concern over the separating of public funds into a process that we have had longstanding opposition to." (Mans depo. at 17). Accordingly, M.F.T. has not met the requirements for standing.

Memorandum Op. at 4 (Mar. 1, 1988). The statement relied on by the district court appears in the deposition of Edward Bolstad, not Richard Mans. In context, Bolstad clearly indicates that M.F.T. opposes the Act because it violates the establishment clause and that as of the date of the deposition, M.F.T. could not trace any teacher terminations to the Act. Bolstad Deposition at 17. He clearly alleges, however, that they also fear the impact of the diversion of funds from public schools on future negotiations and terminations. *Id.* at 30–34; *accord* Mans Deposition at 7–8, 22, 26.

The district court impermissibly construed the record in favor of the *moving* party, and did not even acknowledge nor consider whether there was a realistic threat of injury. The majority opinion compensates for this lapse by concluding that "fear of possible injury" is insufficient to support standing. *Ante* at 1359. That is clearly wrong in light of numerous Supreme Court decisions. *See supra* note 15. Fear of possible injury can support standing where the fear is realistic and plausible. Here, where hundreds of thousands of dollars are involved, there is a strong possibility of teaching reductions or reduced compensation in a district represented by M.F.T. A possibility of even one teacher reduction, or lengthy unrequested leave which leads to resignation, in a school district represented by M.F.T. is all that is required by controlling authority. *See SCRAP, supra* note 14, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14 (discussing cases); *Pennell*, 485 U.S. at 7, 108 S.Ct. at 855, 99 L.Ed.2d at 11; *see supra* pages 1367–1369. A prospective loss of dues is sufficient to support organizational standing. *Hunt*, 432 U.S. at 345, 97 S.Ct. at 3442.

Finally, I note that neither plaintiff is asserting a generalized social grievance no different from the injury anyone might claim. *See Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. at 3324; *Warth, supra* note 9, 422 U.S. at 501, 95 S.Ct. at 2206 ("the injury must be distinct and palpable ... even if it is an injury shared by a large class of other possible litigants."). Here, Mans' injury is clearly direct because the Act can and does affect his workplace. His injuries are shared by those public school teachers similarly and directly affected by the current or future operation of the Act, rather than the public at large.

## V.

For many years, injury in fact was required as a means of satisfying the "gist" of the standing doctrine's concerns, whether there is "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). More recently, the Court has emphasized that standing rules vindicate concerns with "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin, su-*

*pra* note 9, 422 U.S. at 498, 95 S.Ct. at 2205; *see also Allen v. Wright,* 468 U.S. at 750–52, 104 S.Ct. at 3324–25 ("the law of Article III standing is built on a single basic idea—the idea of separation of powers.").

As the Court's language in *Warth* suggests, however, more than just the principle of the separation of powers animates current standing law. It is apparent that standing rules are being increasingly used to reflect a mix of concerns respecting the use of federal judicial review.[18] These concerns include the separation of powers, federalism, aversion to political questions, prudential interests, and other less explicit dispositions.[19]

While the result reached by the district court and this court serves these various interests, their reasoning is deficient in several important respects. Initially, the district court misconstrued taxpayer standing cases and held that an increase in tax burden was required. Next, the district court misapplied the redressability doctrine and speculated on which further events might defeat relief. In addition, the district court improperly read the record to omit injuries claimed by M.F.T., instead describing M.F.T.'s injuries as merely philosophical.

The majority also errs. The majority has relied on the district court's erroneous statement that M.F.T.'s injuries are only philosophical. The majority states that a threatened injury is insufficient to support

standing. The majority has also applied the germaneness requirement of *Hunt* in conflict with *Humane Soc. v. Hodel, Duke Power,* and *Meek v. Pittenger.* I would reverse the district court's judgment in its entirety.

---

18. Thus, standing analysis is required even when a state act is at issue, although the principle of separation of powers arguably should pertain only to the relations between the federal branches of government. *See Myers v. United States,* 272 U.S. 52, 106, 115–17, 47 S.Ct. 21, 22, 25–26, 71 L.Ed. 160 (1926) (discussing constitutional convention and the origins of separation of powers concerns).

19. As a result, the constitutional origins of some aspects of standing law are unclear. For example, it is not apparent that the requirement of redressability is generated by the case or controversy requirement. A case or controversy could otherwise exist even where the relief may be noncoercive, as in the case of declaratory judgments. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Moreover, the separation of powers principle cannot fully explain redressability's

constitutional origin, because if redressability is constitutionally required, we must ignore a congressional grant of standing to a party where their injury is unredressable, in defiance of legislative judgment. *Gladstone, Realtors, supra* note 9, 441 U.S. at 100, 99 S.Ct. at 1608. For this reason, the Court may one day have to return to the language of *Simon,* which reviewed redressability as merely an expounding upon the values which underlie Article III, rather than as an element of the case or controversy requirement. *See Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324 (origin of redressability is constitutional, citing *Valley Forge*); *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (attribution of redressability requirement to Article III case or controversy requirement, citing *Simon*); *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924 (redressability inquiry consistent with Article III limitations).